## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANA MARIE BERNHARDT, Personally and** as the Administratrix of the **ESTATE of JEREMY WISE,** | ) ) ) |
| | ) |
| **E.P., by his Mother and Next Friend** **DANA MARIE BERNHARDT,** | ) ) |
| | ) |
| **MARY LEE WISE,** | ) **Case No. 1:18cv2739** |
| | ) |
| **MARY HEATHER WISE,** | ) |
| | ) |
| **MINDYLOU PARESI, Personally and as the** **Administratrix of the Estate of** **DANE PARESI,** | ) **JURY TRIAL DEMANDED** ) ) |
| | ) |
| **ALEXANDRA VANDENBROEK,** | ) |
| | ) |
| **ELIZABETH SANTINA PARESI,** | ) |
| | ) |
| **JANET PARESI,** | ) |
| | ) |
| **TERRY PARESI,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SANTINA CARTISSER** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| **Serve: Foreign Minister Mohammed Zarif** | ) |
| **Ministry of Foreign Affairs** | ) |
| **Khomeini Avenue** | ) |
| **United Nations Street** | ) |
| **Tehran, Iran** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

NOW COME the Plaintiffs, DANA MARIE BERNHARDT, individually, as guardian of E.P., a minor, and as the Personal Representative of the ESTATE OF JEREMY WISE, MARY LEE WISE, MARY HEATHER WISE, MINDYLOU PARESI, individually, and as the Administratrix of the ESTATE OF DANE PARESI, ELIZABETH SANTINA PARESI, ALEXANDRA VANDENBROEK, JANET PARESI, TERRY PARESI, AND SANTINA CARTISSER  (collectively referred to herein as "Plaintiffs"), by counsel, and for their Complaint against Defendant, the Islamic Republic of Iran ("Iran") state as follows:

## I.    THE PARTIES

1.    Plaintiff Dana Marie Bernhardt is the widow of Jeremy Wise. She qualified as the Administratrix of the Estate of Jeremy Wise in the Circuit Court for the City of Virginia Beach on November 2, 2017. A copy of her Certificate of Qualification is attached as "Exhibit A."

2.    Plaintiff E.P. is the step-son of Jeremy Wise and brings this action through his mother and next friend, Dana Marie Bernhardt. Although he was not adopted, E.P. was the functional equivalent of Jeremy's son.

3.    Plaintiff Mary Lee Wise is the mother of Jeremy Wise.

4.    Plaintiff Mary Heather Wise is the sister of Jeremy Wise.

5.    Plaintiff Mindylou Paresi is the widow of Dane Paresi. She qualified as the Administratrix of the Estate of Dane Paresi in the Superior Court of the State of Washington for the County of Pierce on October 24, 2017. A copy of her Letters of Administration is attached as "Exhibit B."

6.    Plaintiff Alexandra VandenBroek is the step-daughter of Dane Paresi. Although she was not adopted, Alexandra was the functional equivalent of Dane's daughter.

7.   Plaintiff Elizabeth Santina Paresi is the daughter of Dane Paresi.

8.   Plaintiff Janet Paresi is the mother of Dane Paresi.

9.   Plaintiff Terry Paresi is the brother of Dane Paresi.

10.   Plaintiff Santina Cartisser is the sister of Dane Paresi.

11.   Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.   JURISDICTION AND VENUE

12.   Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1367.

13.   Despite its status as a foreign state, Defendant is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's longstanding designation as a "State Sponsor of Terrorism."

14.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

15.   Jeremy Wise was domiciled in the Commonwealth of Virginia at the time of his extrajudicial killing.

16.   Dane Paresi was domiciled in the State of Washington at the time of his extrajudicial killing.

17.   At the time of their extrajudicial killing, Jeremy Wise and Dane Paresi were citizens and nationals of the United States, performing a contract awarded by the United States government, and acting within the scope of their employment.

### III.    NATURE OF THE ACTION

18.    On December 30, 2009, a suicide bomber named Humam Khalil al-Balawi ("Balawi") attacked a secret CIA base in the Khost province of Afghanistan known as Camp Chapman ("Camp Chapman"), killing nine people.

19.    Despite their heroic efforts to stop Balawi, Dane Paresi, a former Green Beret, and Jeremy Wise, a former Navy SEAL, were killed in the terrorist attack.

20.    At the time of the attack, the CIA and the Mukhabarat, the Jordanian intelligence service, believed that Balawi was working for them as a double agent who had infiltrated al Qaeda leadership in Northwest Pakistan.

21.    In fact, top al Qaeda officials, including Ayman al-Zawahiri (al Qaeda's No. 2 leader), Sheikh Saeed al-Masri (al Qaeda's No. 3 leader) and Atiyha Abd al-Rahman (a close bin Laden associate and al Qaeda emissary to Iran), had conspired with Balawi for him to serve as a triple agent and carry out a suicide mission inside Camp Chapman.

22.    The plot to infiltrate Camp Chapman was part of a broader conspiracy by al Qaeda and its allies, including the Taliban and Iran, to attack America and its allies with acts of international terrorism.

23.    Iran has long served as a co-conspirator with al Qaeda. According to the United States Department of the Treasury ("Treasury Department"), Iran has been "a critical transit point for funding to support [al Qaeda's] activities in Afghanistan and Pakistan." Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point (July 28, 2011), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

24.    Up through and even after the Camp Chapman attack, according to the Treasury Department, Iran "serve[d] as the core pipeline through which [al Qaeda] move[d] money,

facilitators and operatives from across the Middle East to South Asia," working with terrorists such as "Atiyah Abd al-Rahman [one of the masterminds behind the Camp Chapman attack], a key [al Qaeda] leader in Pakistan." *Id.*

25.     To carry out the Camp Chapman attack, al Qaeda operatives needed the ability to raise, move, and launder funds internationally; the ability to travel freely and without capture across the border of Iran into Afghanistan and Pakistan; the maintenance and funding of the training camps in Pakistan where Balawi was trained; the ability of Atiyah al-Rahman, a mastermind behind the attack and al Qaeda's emissary to Iran, to move money, facilitators, bomb makers, and operatives into Pakistan; and funding for the communications and training networks that allowed for the development and execution of Balawi's deadly mission.

26.     By knowingly and intentionally providing material support and resources to enable and assist al Qaeda in carrying out international acts of terror, including the Camp Chapman attack, Iran is liable for the resulting deaths of Jeremy Wise and Dane Paresi.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Al Qaeda's Rise and its Support Infrastructure</u>

27.     In 1979, during the Soviet invasion of Afghanistan, Osama bin Laden traveled to Afghanistan to participate in the resistance effort. While there, he founded the terrorist organization that would become al Qaeda, and began to establish the extensive financial and logistical infrastructure that would eventually support the al Qaeda organization. As stated in the Final Report of the National Commission on Terrorist Attacks upon the United States (the "9/11 Commission Report"), "bin Laden understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost world-wide organization."

28.     After the successful conclusion of the Afghan jihad, bin Laden turned his focus away from the Soviet Union and adapted his financial and logistical support network in order to wage a global jihad against the perceived enemies of Islam, predominantly the United States and Israel.

29.     In the years that followed, al Qaeda developed into a highly complex organization with a strategic global vision. According to a former U.S. Director of National Intelligence, al Qaeda's main objectives are: (1) to terrorize the U.S. into retreating from the world stage; (2) to use long wars to financially bleed the U.S. while inflaming anti-American sentiment; (3) to defend the rights of Muslims; and (4) global domination through a violent Islamic caliphate.

30.     In order to accomplish its objectives, al Qaeda uses terrorism as a means to its desired end. Through violent acts ranging from relatively small-scale assassinations to spectacular attacks, it attempts to intimidate civilian populations and influence the strategic decision-making of the U.S. and its allies.

31.     In support of its global jihad, al Qaeda has adopted a number of operational tactics and initiatives in addition to its high-profile terrorist attacks. These include providing resources to military campaigns in conflict regions, supporting and fostering regional jihadist organizations, and engaging in ethnic cleansing operations.

32.     As a result of these strategies, many other terror and extremist organizations became al Qaeda proxies or became operational partners with al Qaeda, thereby extending al Qaeda's capabilities, resources, and sphere of influence.

33.     In addition, al Qaeda owns and operates multiple terrorist training camps, which are considered the "Ivy League" of terror schools. One of those camps served as the training grounds for Balawi in the preparation for his attack on Camp Chapman.

34.     Al Qaeda's ability to plan, authorize, and commit terrorist attacks requires a global support network that has been developed over the last several decades.

35.     For example, the 9/11 Commission Report found that: (1) plans for the 9/11 attacks were carefully vetted through al Qaeda's most senior leadership over a period of nearly six years while those leaders were safely ensconced in training camps and safe houses; (2) the individuals selected to participate in the attacks were chosen from an enormous pool of potential candidates, all of whom were recruited, trained and indoctrinated with the assistance of al Qaeda supporters; and (3) the details of the plan were revised up until the last minute, through a global communication network, the existence of which was dependent on the sponsorship of al Qaeda supporters.

36.     In a similar vein, the Camp Chapman bombing required time, safe spaces, a command structure with the authority and contacts to assemble the needed people, money and explosive materials, the ability to produce videos and other media designed to deceive the United States and Jordanian intelligence communities, a logistics network capable of securely managing the travel of operatives, money, and explosives, access to certain explosive materials and weapons, and reliable communications between coordinators and operatives.

37.     American counter-terrorism officials have repeatedly affirmed the critical importance of al Qaeda's support network as part of its capacity to conceive, plan, coordinate, and conduct sophisticated terrorist acts, including the Camp Chapman attack.

**B.      Iran's Substantial and Pervasive Support for International Terrorism**

38.     Since the Iranian revolution in 1979, Iran has engaged in and supported terrorism as an instrument of its foreign policy.

39.     Iran's support for terrorist groups such as Hezbollah, Hamas, and al Qaeda is well-documented. As a result, the State Department has designated Iran as a foreign state sponsor of terrorism since 1984.

40.     Iran carries out its support of terrorism, in part, through the Islamic Revolutionary Guard Corps ("IRGC"), which is a military force parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The Supreme Leader serves as commander and chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time.

41.     The IRGC also has a constitutional role as defender of the Islamic Revolution and owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

42.     The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the primary branch of the IRGC that promotes and supports terrorism abroad. IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and violent organizations in the world.

43.     The IRGC-QF has historically provided funding and training for terrorism operations targeting American citizens, including support for terrorist organizations like Hezbollah and al Qaeda. These activities are known and sanctioned by Iran's Supreme Leader and are an official platform of Iran's foreign policy.

44.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization."

45.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS") which is an intelligence agency with an annual budget of between $100 million and $400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and terrorism since its inception.

### C.     Iran's Partnership with al Qaeda

46.     Although the majority of Iranians are Shia and al Qaeda is a Sunni organization, those religious differences do not and have not kept Iran and al Qaeda from conspiring together in terrorist activities. According to the 9/11 Commission Report, "the relationship between al Qaeda and Iran demonstrated that Sunni – Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."

47.     The conspiracy between Iran and al Qaeda began in the early 1990s, when bin Laden and al Qaeda were headquartered in Sudan. In 1991, Ayman al Zawahiri, one of the top leaders of al Qaeda, made a secret visit to Iran to ask for help in al Qaeda's campaign to overthrow the government of Egypt.

48.     During the course of subsequent visits between top leadership of al Qaeda and Iran, both in Sudan and Iran, al Zawahiri developed a close relationship with Ahmad Vahidi, a commander within the IRGC-QF. During the course of these meetings, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah, who convinced al Zawahiri and al Qaeda of the power of suicide bombing. This was a change in mindset for al Qaeda because

suicide was prohibited by most Islamic clerics but Mughniyah justified it as an appropriate act of a jihad warrior.

49.     Hezbollah is tightly connected to and controlled by Iran. Mughniyah was acting as an agent of Iran, where he lived for many years, as he coordinated high profile terrorist attacks around the globe and convinced al Qaeda leaders of the appropriateness of suicide bombings.

50.     In 1991 or 1992, al Qaeda and Iranian leaders entered into a secret deal to cooperate in providing support for actions carried out against the interests of Israel and the United States. The alliance included funneling funds and operatives through Iranian territory and the training of al Qaeda fighters. This longstanding conspiracy was confirmed by U.S. Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, in a 2011 press release: "[B]y exposing Iran's secret deal with [al Qaeda] allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism … [Iran was] a critical transit point for funding to support [al Qaeda's] activities in Afghanistan and Pakistan."

51.     After this secret agreement was struck, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives and other terrorist activities.

52.     In 1993, at a meeting in Khartoum, Sudan, Osama bin Laden and Ayman al Zawahiri met with Mughniyah and other Iranian officials including IRGC general Mohammed Baqr Zolqadr to work out the details of the terrorism alliance. Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. At such camps, al Qaeda operatives learned how to build explosives and were trained in intelligence and security.

53.     This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities and with Iranian government officials and IRGC officers fully involved. At all times, Iran's Supreme Leader was aware of the al Qaeda – Iran – Hezbollah coordination and approved of the same.

54.     After the creation of the Iran – Hezbollah – al Qaeda terrorist alliance, the terrorist groups involved conducted a number of attacks against the United States and Israel.

55.     On February 26, 1993, al Qaeda carried out the first World Trade Center bombing, killing six persons and injuring more than 1000.

56.     On June 25, 1996, a terrorist attack against the Khobar Towers housing complex in Saudi Arabia, using a truck bomb, killed nineteen American servicemen and wounded 500 people.

57.     The 9/11 Commission Report examined classified CIA documents that proved an IRGC-QF commander planned the Khobar Towers attack alongside an al Qaeda operative. Moreover, this Court has ruled that Iran was factually and legally responsible for the Khobar Towers bombing. *See Heiser v. Islamic Republic of Iran,* 466 F.Supp. 2d 229 (D.D.C. 2006).

58.     According to NSA intercepts, al Qaeda was involved in the planning and preparations for the Khobar Towers bombing and Osama bin Laden was congratulated by phone on the day of the explosion by Iranian officials.

59.     Two months later, bin Laden issued his first *fatwa* declaring war against the United States and claiming that "the crusader army became dust when we detonated al-Khobar."

60.     On February 23, 1998, Osama bin Laden issued his second public *fatwa* against America, telling Muslims that it was their duty to attack Americans "in any country in which it is possible to do it."

61.     On August 7, 1998, two separate truck bombings destroyed the American

embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania, killing more than 200 people and

wounding more than 4,000.

*62.*     Based in part on the confession of Ali Mohamad, an al Qaeda operative who

masterminded the embassy bombings, this Court held that Iran, the IRGC-QF, MOIS and the

Republic of Sudan all substantially assisted al Qaeda and were legally responsible for the U.S.

Embassy bombings in Kenya and Tanzania. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128,

139 (D.D.C. 2011) (finding that "[s]upport from Iran and Hezbollah was critical to al Qaeda's

execution of the 1998 embassy bombings").

63.     Iran also provided direct support to al Qaeda for the terrorist attacks of September

11, 2001. In particular, Iran provided planning, funding, logistics, such as safe houses, false

documentation and transportation, and facilitation of the hijacker's travel and training. *See*

*Havlish v. bin Laden, et al.,* Case No. 1:03md1570, at 51 (S.D.N.Y. Dec. 22, 2011).

64.     Iran facilitated the travel of at least eight of the 9/11 hijackers by ordering its

border inspectors not to place tell-tale stamps on the passports of the future hijackers when they

traveled to and from Afghanistan through Iran. Intercepts from the National Security Agency

demonstrate that the Iranians were aware they were helping operatives who were part of a plan to

attack the United States.

65.     After the 9/11 attacks, Iran facilitated the escape of some of al Qaeda's leaders

and many of its operatives from the U.S.-led forces who invaded Afghanistan in late 2001 and

early 2002. *See Havlish,* No. 1:03md1570, at 51. Moreover, from the time of the 9/11 attacks and

continuing through 2011, Iran served as a safe haven for al Qaeda leadership and rank and file al

Qaeda members and provided support in the forms of money, lodging, training, expert advice, false documentation, and transportation. *Id.*

66.     The alliance by which Iran provided a sanctuary for al Qaeda leaders arose out of a meeting on or about December 20, 2001, between an al Qaeda leader named Mahfouz Ibn El Waleed, a member of bin Laden's management council and the head of its legal committee, and General Qassem Soleimani, the leader of an elite cell of the IRGC-QF. Pursuant to the sanctuary plan, al Qaeda leaders, their wives and children, as well as hundreds of al Qaeda operatives, were given sanctuary in Tehran, provided with false travel documents, and disguised as Iraqi Shia refugees. Included among them was Abu Mohammed al-Masri, a member of bin Laden's management council who was wanted in connection with the 1998 U.S. embassy attacks.

67.     Upon information and belief, some of the al Qaeda operatives involved in planning and implementing the 9/11 attacks were housed, under this sanctuary plan, at four-star hotels in Iran and provided with room service, movies, and swimming pool facilities.

68.     Once the sanctuary plan was in place, al Qaeda's re-formed council, under the leadership of al-Masri and others, planned attacks from inside Iran, targeting residential compounds in Saudi Arabia.

69.     On May 12, 2003, two bombings took place at the targeted residential compounds, killing thirty-nine people and wounding 160 others. Nine United States citizens were killed in the attack and more than two dozen Americans were injured.

70.     At the urging of the United States, Iranian authorities ostensibly placed some members of the management council under limited house arrest, but, in reality, gave them continued freedom to operate, communicate with other al Qaeda leaders, and fundraise. Other al

Qaeda members were provided funding, weapons and transportation and were then deployed, among other places, in Baghdad, where they began targeting U.S. troops.

71.     Over the next several years, Iran provided al Qaeda leaders with various forms of aid and support, including false travel documents, safe harbor, communications technology, training (including small unit tactics, small arms training, explosives and indirect fire weapons training), weapons, financing, and even anti-drone technology.

72.     Iran has also actively arranged weapons shipments to al Qaeda through the Taliban since at least 2006. These weapons include small arms and ammunition, rocket propelled grenades, mortar rounds, 107 mm rockets, and explosively formed penetrators, a particularly powerful shrapnel-charged explosive device designed to penetrate armored vehicles.

73.     In addition to these weapons, Iran has provided al Qaeda with plastic explosives of the type used by al Qaeda and Balawi at Camp Chapman, and with training in the construction of sophisticated explosive devices for use against Americans in Iraq and Afghanistan.

74.     In a 2007 letter, bin Laden criticized an al Qaeda operative for threatening to attack Iran. "We expect you would consult with us for these important matters, for as you are aware, Iran is our main artery for funds, personnel, and communication, as well as the matter of hostages." Letter to Karim, 1 (Oct. 18, 2007), available at https://www.dni.gov/files/documents/ubl2016/english/Letter%20to%20Karim.pdf.

75.     In 2009, pursuant to Executive Order 13224, the Treasury Department designated four al Qaeda associates living in Iran as terrorists who provided support for al Qaeda. It accused Iran, and specifically the IRGC, of harboring and supporting al Qaeda terrorists. Treasury Targets Al Qaida Operatives in Iran (Jan. 16, 2009), available at https://www.treasury.gov/press-center/press-releases/Pages/hp1360.aspx.

76.     In July 2011, in a press release issued pursuant to Executive Order 13224, the

Treasury Department reported that Iran had continued to allow al Qaeda to channel money and

operatives through its country:

> Iran is a critical transit point for funding to support [al Qaeda] activities in
> Afghanistan and Pakistan. This network serves as the core pipeline through
> which [al Qaeda] moves money, facilitators and operatives from across the
> Middle East to South Asia, including to Atiyah Abd al-Rahman, a key [al
> Qaeda] leader based in Pakistan, also designated today.

Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit

Point (July 28, 2011), available at https://www.treasury.gov/press-center/press-

releases/Pages/tg1261.aspx.

77.     The Treasury Department also designated Atiyah Abd al-Rahman as a senior

member of al Qaeda's leadership and made him subject to American sanctions identifying him as

al-Qaeda's "overall commander in Pakistan's tribal areas as of late 2010" who was appointed to

serve as al-Qaeda's "emissary in Iran, a position which allowed him to travel in and out of Iran

with the permission of Iranian officials." *Id.* Separately, a one-million-dollar reward was offered

by the DOJ for information leading to the whereabouts of al-Rahman.

78.     al-Rahman is the same terrorist who "engineered" the Camp Chapman bombing, a

fact that was confirmed in a eulogy published by al Qaeda in his honor.

79.     A 2013 State Department country report on terrorism confirmed that Iran

was facilitating al Qaeda during the time frame relevant to this lawsuit, stating that "Iran

has been operating under an alliance with al Qaeda since the early 1990s by which Iran

provides material support for terrorism including financing, facilitation of travel, training,

safe havens and operational support."

80.     The State Department continues to cite Iran as the most active state sponsor of terrorism in the world. Experts estimate that Iran provides ongoing financial support to terrorism in the hundreds of millions or even billions annually.

81.     In its 2009 report, published the year of the Camp Chapman attack, the State Department declared: "Iran remained the most active state sponsor of terrorism. Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf and undermined the growth of democracy."

**D.     The Camp Chapman Attack**

82.     On December 30, 2009, Balawi, acting under the direction of al Qaeda, carried out a suicide bombing attack at Camp Chapman in Afghanistan.

83.     Balawi was a Jordanian pediatrician and the author of a radical blog that he wrote under the pen name Abu Dujana al-Khorasani ("Abu Dujana").

84.     Balawi saw himself as a cyber-warrior for Islam and for terrorist groups such as al Qaeda. His blog posts were incendiary and graphic. For example, he put together a collage of Iraqi insurgents attacking American transport vehicles and gloated: "Watch how the Americans get killed as if they were in Play Station video games."

85.     His posts frequently contained battlefield scenes sent by jihadist photographers. For example, in one post he welcomed his readers to the "al-Hesbah Café. Go to the menu and pick today's dish." The "dishes" that he featured were "roasted Humvee with sauce of human remains. Exploded tank by an IED with no survivors or a pastry made of Americans' brains taken out with sniper bullets."

86.     His postings became some of the most widely read items from radical Islamic sites and the ones that would draw the most user interactions. Eventually, he took on the role as the moderator of the radical al-Hesbah site, a jihadist web site closely tied to al Qaeda and other terrorist groups.

87.     Writing as Abu Dujana, Balawi frequently defended terrorist leaders like bin Laden and al-Zawahiri, and many people came to believe he was a spokesperson for al Qaeda.

88.     On January 20, 2009, Balawi was arrested by the Mukhabarat and held for three days.

89.     Following his arrest and interrogation, Balawi continued to meet with agents of the Mukhabarat who became convinced that they had flipped or turned Balawi. Balawi told the agents what he knew about al-Hesbah and the other jihadist bloggers and their funding. At the time, al-Hesbah was the only major al Qaeda-linked website that was still active.

90.     Eventually the Mukhabarat convinced Balawi to go to Pakistan in an attempt to penetrate the al Qaeda network and serve as an informant.

91.     Knowing that Taliban leaders were working in an alliance with al Qaeda leaders in the training areas of Pakistan, the CIA and the Mukhabarat were hopeful that they could use Balawi to gain information about the location of top al Qaeda leaders, including Osama bin Laden.

92.     Balawi arrived in the mountains of northwest Pakistan in March of 2009 and claimed that by providing medical services he was able to ingratiate himself with leaders of the Taliban and the al Qaeda network.

93.     In mid-May 2009, Balawi told his Mukhabarat handlers that he had accepted an invitation to move in with some members of the Taliban so they could use his medical skills.

94.      In August, Balawi gained access to Sheikh Saeed al Masri, al Qaeda's number three leader, who served as a member of al Qaeda's management council and had been granted sanctuary in Iran after the 9/11 attacks. During that time al Masri planned the 2003 attacks on the residential compounds in Saudi Arabia.

95.      Unknown to the Mukhabarat and the CIA, al Masri hatched the idea of using Balawi's access to al Qaeda leaders as a lure and a trap. As a first step, he orchestrated the filming of a short video of Balawi in the presence of al-Rahman.

96.      Together with bin Laden, al-Rahman had escaped into Pakistan following the 9/11 attacks. He eventually fled to Iran where, along with al Masri and others, he was provided with safe harbor. al Rahman emerged from Iran in 2006 as one of al Qaeda's top strategists and spiritual advisors.

97.      The video, taken by a hand-held camera, was sent to Balawi's Jordanian handler via encrypted email. It seemed to confirm to the Jordanian and American intelligence communities that Balawi had personal access to al-Rahman. It had been eight years since anyone within American or Jordanian intelligence had known the location of al-Rahman.

98.      Balawi followed the email with other messages containing detailed descriptions of jihadist fighters and discussions among Taliban and al Qaeda leaders, all as authorized by al Qaeda leadership to convince the Jordanians and Americans that Balawi had access to top-level al Qaeda information and was willing to cooperate. Balawi also gave on-the-ground reports about damage from drone attacks and other information that the CIA was able to independently confirm.

99.      In November of 2009, Balawi sent an email indicating that he had become the personal doctor for al-Zawahiri, second in command of al Qaeda. Balawi described al-Zawahiri's

various health problems with such detail that he appeared to have first-hand knowledge and

access. This information was quickly distributed throughout the CIA and before long, Leon

Panetta, the CIA Director, was discussing it directly with President Obama and the national

security team.

100.    The CIA, working with contacts at the Mukhabarat, put together a plan to meet

Balawi and give him the technology needed to precisely locate and kill al-Zawahiri.

101.    As part of the plan, the CIA provided Balawi with a cover story that he needed to

embark on some brief travel in order to purchase medicine for al-Zawahiri.

102.    In reality, he would be transported to Camp Chapman by a trusted Afghan

security officer posing as his driver. The operational plan, approved at the highest levels of the

CIA, focused on treating Balawi with respect and even included a warm reception complete with

medical care and a surprise birthday cake.

103.    Balawi would not be checked or frisked at the main gate so that his face would

not be seen by any Taliban spies who may be present among the Afghan soldiers manning the

outer perimeter of Camp Chapman. Once inside the compound, Balawi would meet with a

variety of senior agents and technicians so he could learn how to send secret signals to

communicate where and when a strike could take place against al-Zawahiri.

104.    Security personnel at Camp Chapman included Dane Paresi and Jeremy Wise.

Dane Paresi was a former Green Beret who had served multiple tours in Afghanistan and earned

the Bronze Star. Jeremy Wise was a former Navy SEAL and veteran of the Iraq War.

105.    Both Paresi and Wise objected to the operational plan for security reasons, but

their objections were overruled due to the perceived benefit of Balawi's apparent access to top al

Qaeda leaders.

106.     Meanwhile, in the weeks leading up to the meeting, al Qaeda operatives were training Balawi in the use of small arms, explosives, and the tactics necessary to successfully execute a mission as a suicide bomber.

107.     Balawi's suicide vest was sophisticated and expertly designed by a top al Qaeda bomb-maker known as "al Qaeda's tailor." The vest was similar to, although more sophisticated than, the suicide vests used throughout the al Qaeda, Hamas, and Hezbollah networks.

108.      Balawi's suicide vest was armed with thirty pounds of Composition C-4, a powerful military-grade plastic explosive. The explosive material was interwoven with small metal items such as ball bearings, nails, and children's toy jacks. The purpose of this design was to inflict the maximum amount of carnage and suffering upon the intended victims.

109.     C-4 is more expensive and more difficult to obtain than the homemade explosive agents typically used in al Qaeda's suicide vests. One of the ways al Qaeda obtains C-4 is through weapons shipments directly from or orchestrated by Iran.

110.     As noted previously herein, al Qaeda training grounds in Pakistan existed, in large part, because of the funding and material support provided by Iran and its IRGC-QF. As the Treasury Department stated: "Iran is a critical transit point for funding to support [al Qaeda] activities in Afghanistan and Pakistan. This network serves as the core pipeline through which [al Qaeda] moves money, facilitators and operatives from across the Middle East to South Asia."

111.     As he was preparing to carry out his suicide attack, Balawi wrote essays on his thoughts about becoming a martyr and filmed at least three lengthy videos. It would be a blessing from Allah, Balawi said, to have his limbs, his bones and his teeth turned into shrapnel.

112.     On December 30, 2009, Balawi was picked up by the Afghan driver at the border between Pakistan and Afghanistan. The car carrying Balawi arrived at Camp Chapman at approximately 4:30 p.m. local time.

113.      In accordance with the CIA plan, the vehicle was waived through three security checkpoints, without being searched, before arriving at its final destination inside the base. A team of sixteen people were waiting, including Dane Paresi and Jeremy Wise.

114.     Jeremy Wise opened the car door for Balawi, but he slid across the seat to exit on the other side. When Dane Paresi and Jeremy Wise saw that Balawi had one hand hidden inside his clothing, they raised their weapons and shouted at Balawi to get his hands up.

115.     Despite the indications that Balawi intended to detonate a suicide bomb, and not wanting to kill a potentially valuable informant or to detonate the bomb by shooting Balawi, Dane Paresi moved toward Balawi in an attempt to thwart or mitigate the attack. In the same moment, Jeremy Wise moved in, preparing to dive at Balawi.

116.     In spite of their heroism, Dane Paresi and Jeremy Wise were unable to reach Balawi before he detonated his vest, killing both men, along with seven others.

117.     This suicide bombing was planned and orchestrated by al Qaeda. Moreover, at the time of this terrorist act, Balawi was acting as an agent of al Qaeda, advancing their terrorist agenda, which included causing the deaths of innocent people in an attempt to intimidate civilian populations, influence the policy of the United States and its allies, and/or to affect the conduct of the United States government.

118.     This terrorist act was a reasonably foreseeable consequence of Iran's financial and logistical support of al Qaeda described throughout this Complaint.

119.    Iran and its IRGC-QF are directly linked to this terrorism act because Iran, among other things, provided safe haven, travel facilitation, funding, and training for the leaders who planned and operationalized the attack. Iran also served as the core pipeline through which al Qaeda moved money, facilitators, and operatives into its training grounds in Pakistan and provided training, expertise, transport, and materials for the development of high-impact explosives like the ones detonated by Balawi.

## V.    CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE EXTRAJUDICIAL KILLING OF JEREMY WISE (28 U.S.C. § 1605A(c))

120.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

121.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

122.    Iran provided material support and resources to al Qaeda for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of al Qaeda, including the fomenting of general unrest in Pakistan and Afghanistan and the jihad against the United States and Israel. As part of this jihad, al Qaeda carried out attacks against Americans.

123.    As such, Iran's provision of material support and resources to al Qaeda was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Jeremy Wise, is an expected and welcomed result of those actions.

124.    Such conduct violates 28 U.S.C. § 1605A.

125.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

126.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Jeremy Wise was killed in the suicide bombing attack on Camp Chapman.

127.    As a direct and proximate result of Iran's actions, Dana Marie Bernhardt, E.P., Mary Lee Wise, and Mary Heather Wise have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Jeremy Wise's society and comfort.

128.    Iran's continuing provision of material support to those willing to commit murder and other terrorist acts is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT II – PROVISION OF MATERIAL SUPPORT AND RESOURCES FOR THE EXTRAJUDICIAL KILLING OF DANE PARESI (28 U.S.C. § 1605A(c))

129.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

130.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

131.    Iran provided material support and resources to al Qaeda for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of al Qaeda, including the fomenting of general unrest in Pakistan and Afghanistan and the jihad against the United States and Israel. As part of this jihad, al Qaeda carried out attacks against Americans.

132.    As such, Iran's provision of material support and resources to al Qaeda was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Dane Paresi, is an expected and welcomed result of those actions.

133.    Such conduct violates 28 U.S.C. § 1605A.

134.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

135.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Dane Paresi was killed in the suicide bombing attack on Camp Chapman.

136.     As a direct and proximate result of Iran's actions, Mindylou Paresi, Alexandra VandenBroek, Elizabeth Santina Paresi, Janet Paresi, Terry Paresi, and Santina Cartisser have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Dane Paresi's society and comfort.

137.     Iran's continuing provision of material support to those willing to commit murder and other terrorist acts is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

For Count I, the following:

    a.  Compensatory damages for the death of Jeremy Wise, including pain and suffering and economic damages, to the Estate of Jeremy Wise, in the amount of $10,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $20,500,000, comprised of the following sums:

        - $8,000,000 on behalf of Dana Marie Bernhardt, wife of Jeremy Wise;

        - $5,000,000 on behalf of E.P., step-son of Jeremy Wise;

        - $5,000,000 on behalf Mary Lee Wise, mother of Jeremy Wise;

        - $2,500,000 on behalf Mary Heather Wise, sister of Jeremy Wise.

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Jeremy Wise;

    d. Interest, from December 30, 2009 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count II, the following:

    a. Compensatory damages for the death of Dane Paresi, including for pain and suffering and economic damages, to the Estate of Dane Paresi, in the amount of $10,000,000, or a sum certain to be determined at trial;

    b. Solatium damages in a total amount of $28,000,000, comprised of the following sums:

        - $8,000,000 on behalf of Mindylou Paresi, wife of Dane Paresi;

        - $5,000,000 on behalf of Alexandra VandenBroek, step-daughter of Dane Paresi;

        - $5,000,000 on behalf of Elizabeth Santina Paresi, daughter of Dane Paresi;

        - $5,000,000 on behalf of Janet Paresi, mother of Dane Paresi;

        - $2,500,000 on behalf Terry Paresi, brother of Dane Paresi;

        - $2,500,000 on behalf Santina Cartisser, sister of Dane Paresi;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Dane Paresi;

    d. Interest, from December 30, 2009 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: November 26, 2018          Respectfully submitted,

      /s/ Kevin A. Hoffman_____

Randy D. Singer (DCD Bar No. VA057)
Kevin A. Hoffman (DC Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*