UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANA MARIE BERNHARDT *et al.*,

    *Plaintiffs*,

v.

ISLAMIC REPUBLIC OF IRAN *et al.*,

    *Defendants*.

Civil Action No. 18-2739 (TJK)

### MEMORANDUM OPINION

    The families of two deceased American contractors sue Iran and four related financial institutions—the HSBC Defendants—for their alleged roles in an al-Qaeda terrorist's 2009 suicide attack at a military installation in Afghanistan. Before the Court is the HSBC Defendants' motion to dismiss the claims against them, asserted under the Justice Against Sponsors of Terrorism Act, for (1) lack of personal jurisdiction over the non-U.S. HSBC Defendants and (2) failure to state a claim as to all the HSBC Defendants. For the reasons explained below, the Court will grant the motion and dismiss the claims against the HSBC Defendants.

**I.    Background**

    According to the Amended Complaint, on December 30, 2009, Humam Khalil al-Balawi, a suicide bomber, attacked personnel at Camp Chapman, a "secret CIA base" in Afghanistan, killing nine, including Dane Paresi, a former Green Beret, and Jeremy Wise, a former Navy SEAL. ECF No. 10 ("Am. Compl.") ¶¶ 22–23, 227. The Central Intelligence Agency (CIA) allegedly thought that Balawi was a double agent working for the United States by infiltrating al-

Qaeda's leadership in Northwest Pakistan.  *Id.* ¶ 24.  Instead, tragically, he was a triple agent loyal to al-Qaeda.  *Id.* ¶ 25.

But according to Plaintiffs, the Camp Chapman suicide attack was part of a broader conspiracy by al-Qaeda and its allies, including the Islamic Republic of Iran ("Iran"), to attack the United States and its allies with acts of international terrorism.  *Id.* ¶ 26.  Plaintiffs allege that Iran has long supported al-Qaeda, *id*. ¶¶ 56-101, and, relevant here, served as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan," *id.* ¶ 27.  Plaintiffs further allege that the conspiracy was facilitated by a larger group of co-conspirators who "willingly provided material support and resources to the conspirators, including financial services, while knowing that such services would facilitate terrorist attacks" like the one at Camp Chapman, including Bank Melli Iran ("Bank Melli"), Bank Saderat PLC in Iran ("Bank Saderat") and Al Rajhi Bank in Saudi Arabia.  *Id.* ¶ 29.

One step further, Plaintiffs allege that the four related financial institutions at issue here—HSBC Holdings PLC ("HSBC"), HSBC Bank PLC ("HBEU"), HSBC Bank USA, N.A. ("HBUS"), and HSBC North America Holdings Inc. ("HBNA") (collectively, the "HSBC Defendants")—funded and facilitated this conspiracy by laundering funds and engaging in other illicit financial transactions with Iran and these other co-conspirators.  *Id.* ¶ 29.  HSBC is a United Kingdom bank holding company with its principal place of business in London, which "owns and/or controls" HBEU, HBNA, and HBUS.  *Id.* ¶ 12; ECF No. 32 ("MTD") at 4.  HBEU is a financial institution organized under the laws of England and Wales, also headquartered in London.  Am. Compl. ¶ 13; MTD at 4.  HBNA is a holding company located in New York City that owns HBUS, a nationally chartered bank that operates more than 240 bank branches throughout the United States.  Am. Compl. ¶¶ 14-15; MTD at 4.

According to Plaintiffs, the HSBC Defendants joined a financial conspiracy to provide material support for these acts of terrorism by, among other things, over "the course of nearly ten years . . . purposely, knowingly, and/or recklessly violat[ing] the [anti-money laundering] statutes and other economic sanctions levied against Iran and various Iranian banking institutions, *id*. ¶ 31, and providing "substantial assistance to banks known to be connected to the same terrorist financial network, such as Al Rajhi Bank, *id.* at 36. In particular, Plaintiffs allege that the HSBC Defendants—in particular HBUS and HBEU—joined the financial conspiracy by devising fraudulent schemes in which they "stripped" or "repaired" transactions with Iranian banks, including Bank Melli and Bank Saderat ("the Iranian Banks"), to hide the true nature of transactions that originated in Iran or were otherwise associated with Iran or Specially Designated Nationals and Blocked Persons (SDNs). *Id.* ¶¶ 32, 134-37. Thus, Plaintiffs say, they allowed those transactions to avoid detection by the Treasury Department's Office of Foreign Assets Control (OFAC), thereby intentionally violating U.S. law.[1] *Id.* ¶ 32. Similarly, Plaintiffs assert that the HSBC Defendants, especially HBUS and HBEU, engaged in fraudulent schemes to avoid OFAC detection, including one in which they would style transactions as bank-to-bank "cover" transactions to hide the identity of the transaction originator, also in violation of U.S. law. *Id.* ¶¶ 33, 138-50. According to Plaintiffs, in 2010, HBUS hired Deloitte LLP as an outside auditor to identify OFAC-sensitive transactions that the HSBC Defendants had illegally conducted. *Id.* ¶ 34. That review identified more than 25,000 illegal transactions involving Iran, valued at more than $19.4 billion. *Id.* On top of these alleged violations, according to Plaintiffs,

---

[1] According to the Amended Complaint, in 2006, OFAC announced sanctions against Bank Saderat, and a year later, listed Bank Saderat as a specially designated global terrorist (SDGT). *Id.* ¶ 103–04. In 2007, OFAC named Bank Melli as an SDN. *Id.* ¶ 109.

3

the HSBC Defendants assisted banks with connections to al-Qaeda, such as Al Rajhi Bank, which was widely known to serve as a conduit for terrorist transactions.[2]  *Id.* ¶¶ 35, 151-185.  Despite pressure from HBUS's own in-house compliance department to end the affiliation, they say, it provided Al Rajhi Bank access to nearly one billion dollars in U.S. banknotes through 2010.  *Id.* ¶ 177-182.  Finally, Plaintiffs accuse the HSBC Defendants of advancing the conspiracy by maintaining intentionally weak anti-money laundering policies and failing to perform adequate due diligence in various ways, including relating to its correspondent bank relationships.  *Id.* ¶¶ 186-202.

The Amended Complaint asserts two counts against the HSBC Defendants under the Justice Against Sponsors of Terrorism Act (JASTA), 18 U.S.C. § 2333(d): one for aiding and abetting the extrajudicial killings of Paresi and Wise (Count II), and the other for participating in a conspiracy that caused their deaths (Count III).  Earlier this year, the HSBC Defendants moved to dismiss these counts, asserting that (1) the Court lacks personal jurisdiction over the two non-U.S. HSBC Defendants, HSBC and HBEU,[3] and (2) the Amended Complaint must be dismissed as to all HSBC Defendants because Plaintiffs have failed to state a claim against them under JASTA's secondary liability provisions.  ECF No. 32.

## II.    Legal Standards

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of making "a *prima facie* showing of the pertinent jurisdictional facts."  *Livnat v.*

---

[2] Plaintiffs allege that the Treasury Department identified Sulaiman bin Abdulaziz Al Rajhi, a founder of Al Rajhi Bank and its former Chief Executive Officer and Chairman of the Board, as a key financial contributor to al-Qaeda.  *Id.* ¶ 118–19.  And they assert that as early as 2003, the CIA designated Al Rajhi Bank as a conduit for extremist financing.  *Id.* ¶ 122.

[3] The HSBC Defendants do not contest personal jurisdiction over HBUS and HBNA.  MTD at 7 n.3.

4

*Palestinian Auth.*, 851 F.3d 45, 56–7 (D.C. Cir. 2017) (internal quotes omitted). A plaintiff "must allege specific acts connecting [each] defendant with the forum." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 (D.D.C. 2018) (quoting *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)). Factual disputes must be resolved in favor of the plaintiff, but the Court need not accept unsupported inferences. *Livnat*, 851 F.3d at 57.

"To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court should consider only well-pleaded factual allegations and ignore mere conclusory legal statements. *Id.*

**III.  Analysis**

  **A.  Personal Jurisdiction**

Plaintiffs argue that this court has specific personal jurisdiction over HSBC and HBEU under Rule 4(k)(2) of the Federal Rules of Civil Procedure.[4] That Rule permits a federal court to exercise jurisdiction over (1) a claim arising under federal law, (2) against a defendant served by a summons, (3) that is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States. *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). The parties do not dispute that

---

[4] In their motion, Defendants note that "Plaintiffs do not appear to advance a theory of general jurisdiction, nor could they," MTD at 9 n.4, and Plaintiffs do not quarrel with this proposition in their opposition, ECF No. 33.

first three elements are satisfied: (1) Plaintiffs' claims arise out of federal law, 18 U.S.C. § 2333(d), Am. Compl. ¶¶ 254–80; (2) HSBC and HBEU formally agreed to waive service, ECF Nos. 14–15; and (3) HSBC and HBEU assert that they "are not subject to jurisdiction in any state's court of general jurisdiction,"[5] MTD at 9.

Thus, the Court's personal jurisdiction over HSBC and HBEU turns on the final element. "Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11. This requires the Court to determine "if the defendant has purposefully directed his activities at residents of the forum and [if] the litigation results from alleged injuries that arise out of or relate to those activities." *Id*. at 12 (cleaned up). The Court concludes that even if HSBC and HBEU purposefully directed their activities at the United States, Plaintiffs have not shown that their injuries arise out of or relate to those activities. Thus, the Court cannot exercise personal jurisdiction over HSBC and HBEU.

Plaintiffs allege that these entities—that represent that they have no "representative offices, direct subsidiaries, or branches in the United States," MTD at 9—directed their activities at financial markets and institutions in this country in various ways during the purported financial conspiracy outlined above. They assert that HBEU had contact with the United States through the various schemes that it undertook with HBUS, which operates in the United States. *See* Am. Compl. ¶¶ 136-37, 139, 153. They allege that HBEU and HBUS communicated directly about those schemes. *See id.* ¶¶ 143, 153. And their allegations make clear that these

---

[5] When "the defendant contends that he cannot be sued in the forum state and refuses to identify any other [forum] where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Mwani*, 417 F.3d at 11.

6

schemes were directed at circumventing United States law, *id.* ¶¶ 146, 147, 153, and some were referred to as U.S. dollar clearing services, emphasizing the role of U.S. currency, *id.* ¶¶ 153, 156, 164.

Plaintiffs similarly allege that HSBC directed its activities at the United States. They assert that HSBC also communicated directly with HBUS—again, which operates here—to pressure or direct it to restore its banknotes business with Al Rajhi Bank, *see* Am. Compl. ¶¶ 177-79. They allege that in 2003, HSBC's head of compliance warned that amending payment messages "could provide the basis for an action against [HSBC] Group for breach of sanctions." Am. Compl. ¶ 157. Despite this concern, they assert that several times HSBC provided the approval necessary for HBEU to continue its U.S. sanctions-evading program. *Id*. ¶¶ 156–57. And they allege that HSBC, in connection with a deferred prosecution agreement, admitted that through these schemes it had violated U.S. law and undermined U.S. national security, foreign policy, and sanctions programs. *Id*. ¶¶ 37, 202.

But even assuming these contacts show that HSBC and HBEU purposely directed their activities at the United States, Plaintiffs must also show that "the litigation results from alleged injuries that arise out of or relate to those activities." *Mwani*, 417 F.3d at 12 (cleaned up). To satisfy this prong, "the plaintiff must show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 27 (D.D.C. 2017)). Plaintiffs do not show that their injuries, caused by the tragic suicide attack at Camp Chapman, "arose out of" or "relate to" HSBC and HBEU's contacts with the United States so as to support this Court's personal jurisdiction over them.

Plaintiffs simply do not explain how these alleged activities link up to al-Qaeda's suicide attack on Camp Chapman. They do not, for example, allege that HSBC and HBEU executed any

7

of the transactions at issue for the benefit of al-Qaeda or that the transactions played any role in the attack itself. And while Plaintiffs allege that the Banks had ties to Iran and terrorist organizations,[6] and that HSBC and HBEU should have known about those connections, they do not assert that the Banks were involved in the attack or even that they had ties to al-Qaeda at the time of the attack. At most, they allege that, simply because HSBC and HBEU helped the Banks avoid U.S. sanctions, they "should have known" that their banking services were being used "to facilitate the laundering of funds needed for groups like al-Qaeda to operate." Am. Compl. ¶ 150; *see also* ¶ 38 (alleging that it should have been reasonably foreseeable to the HSBC Defendants that their activities would have facilitated attacks like the one at Camp Chapman). But Plaintiffs point to no case in which a court has found specific personal jurisdiction over a foreign bank for its involvement in an alleged terrorist attack based on similar allegations. Indeed, as the HSBC Defendants note, three courts have already declined to exercise personal jurisdiction over HSBC on allegations similar to those here. *See Siegel v. HSBC Holdings*, No. 17-cv-6593 (DLC), 2018 WL 501610 at *2 (S.D.N.Y. Jan. 19, 2018); *Zapata v. HSBC Holdings*, No. 1:16-CV-030 (ASH), 2017 WL 6939209, at *4 (S.D. Tex. Sept. 14, 2017); *Siegel v. HSBC Holdings*, 283 F. Supp. 3d 722, 727-29 (N.D. Ill. 2017). As one court put it, allegations "that a bank provides financial services to clients that associate with al-Qaeda, thereby aiding al-Qaeda, are not enough" to show that a claim "arises out of those contacts . . . for personal jurisdiction purposes." *Siegel*, 2018 WL 501610, at *4 (cleaned up). *See also In re Terrorist Attacks*, 718 F.

---

[6] *See generally* Am. Compl. ¶¶ 102–05 (In 2006, Under-Secretary for Terrorism and Financial Intelligence stated that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year"); *id.* ¶¶ 106–10 (In 2007, the Department of the Treasury found that Bank Melli "provides banking services to the IRGC and the *quds* force."); *id.* ¶¶ 111–26 (In 2003, the CIA concluded that Al Rajhi Bank was a "[c]onduit for extremist financing" and identified its former CEO as a "key financial contributor[]" for al-Qaeda).

Supp. 2d 456, 480 (S.D.N.Y. 2010) ("The due process rights of a foreign defendant protects him from being subject to the jurisdiction of the American courts based solely on allegations that he provided . . . financial services to entities with al-Qaeda ties.").

Finally, Plaintiffs find no support in *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010), the key case they cite in support of personal jurisdiction over HSBC and HBUS. In that case, as they assert, the court found that "the alleged jurisdictional fact that [the Bank of China] knowingly performed a wire transfer for [Palestinian Islamic Jihad] through one of its U.S. branches support[ed] a finding of specific personal jurisdiction." 755 F. Supp. 2d at 34. But there, the bank was alleged to have executed financial transactions directly on behalf of the terrorist organization that committed the attack in question, and the bank was alleged to have been told by Chinese authorities that the specific transactions at issue were enabling the terrorist activities of the organization. *Id.* Thus, where "a bank has knowledge that it is funding terrorists . . . contacts created by such funding can support such a finding [of specific jurisdiction]." *Id.* No similar jurisdictional facts are pled here.

Because Plaintiffs have failed to plead that their injuries caused by the suicide attack at Camp Chapman "arose out of" or "relate to" HSBC and HBEU's contacts with the United States, this Court must dismiss the claims against them for lack of personal jurisdiction.

B.     **Failure to State a Claim**

Plaintiffs bring aiding-and-abetting and conspiracy claims against the remaining HSBC Defendants, HBUS and HBNA,[7] under JASTA's secondary liability provision, 18 U.S.C. § 2333(d)(2). This provision provides that:

---

[7] Because the Court finds it lacks personal jurisdiction over HSBC and HBEU, the Court only addresses the HSBC Defendants' arguments that Plaintiffs fail to state a claim against HBUS and HBNA.

9

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

*Id.* Subsection (a) creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Acts of "international terrorism," as defined in 18 U.S.C. § 2331(a), include activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States.

While the D.C. Circuit has not directly addressed JASTA claims for aiding-and-abetting or conspiracy, in that statute Congress identified *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) as "the proper legal framework" for how its "Federal civil aiding and abetting and conspiracy liability" claims should function. Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852; *see Freeman v. HSBC Holdings*, 18-CF-7359 (PKC) (CLP), 19-CV-2146 (PKC) (CLP), 2020 WL 3035067 at *5 (E.D.N.Y. June 5, 2020) (quoting *Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217, 223 (2d Cir. 2019)); *cf. Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277 (D.C. Cir. 2018). Thus, courts that have considered JASTA secondary-liability claims use the *Halberstam* framework.

*See, e.g.*, *Linde v. Arab Bank*, 882 F.3d 314 (2d Cir. 2018); *Atchley v. AstraZeneca UK Ltd.*, 17-2136 (RJL), 2020 WL 4040345 (D.D.C. July 17, 2020) (appeal filed).

As a threshold matter, to state a claim for liability under JASTA a plaintiff must plausibly allege that an injury arose "from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned or authorized." 18 U.S.C. § 2333(d)(2). Plaintiffs allege, and the HSBC Defendants do not contest, that (1) Plaintiffs suffered injuries (the deaths of Wise and Paresi), (2) al-Qaeda, a designated Foreign Terrorist Organization (FTO), was responsible for the suicide attack at Camp Chapman, and (3) the attack was an act of international terrorism. The Court thus moves on to consider each claim of secondary liability under JASTA.

        1.        **Aiding-and-abetting (Count II)**

There are three elements to a JASTA aiding-and-abetting claim: (1) the defendant-aided party must perform a wrongful act causing injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity when he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal act. *Halberstam*, 705 F.2d at 477. Failure to allege all three *Halberstam* elements requires dismissal. *See, e.g.*, *Siegel*, 933 F.3d at 224 (dismissing aiding-and-abetting claim because the plaintiffs failed to allege two of the three *Halberstam* elements).

Plaintiffs fail to plausibly allege the second and third *Halberstam* elements. The second element requires an allegation that HBUS and HBNA were "aware" that, by assisting the Banks, they themselves were "assuming a role in terrorist activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477). "Thus, although a defendant need not know of or intend to bring

11

about the specific attacks at issue, the Complaint must allege plausibly that, in providing financial services, Defendants were 'generally aware' that they were thereby playing a 'role' in an FTO's violent or life-endangering activities." *O'Sullivan v. Deutsche Bank*, 1:17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (quoting *Linde*, 882 F.3d at 329). Moreover, "failure . . . to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities." *Kaplan v. Lebanese Canadian Bank*, 405 F. Supp. 3d 525, 535 (S.D.N.Y. 2019). Instead, a plaintiff must plead that a defendant was "aware that through its own conduct . . . it [was] assuming a role in actual terrorist activity." *Freeman*, 2020 WL 3035067, at *7.

The allegations in the Amended Complaint come up well short of this high bar. Plaintiffs fail to allege that HBUS and HBNA were aware they were supporting al-Qaeda, much less "assuming a role" in al-Qaeda's violent activities. For the most part, Plaintiffs allege that HBUS and HBNA may or should have known about the Banks' connections to terrorist financing because of well-known public information.[8] But that is not enough to establish that Defendants were aware of any role of their own in terrorist activities. *See Linde*, 882 F.3d at 329–30 (distinguishing the awareness necessary to sustain an aiding-and-abetting claim from the mens rea for material support "which requires only knowledge of the organization's connection to

---

[8] *See* Am. Compl. ¶ 57 (designation of Iran as a foreign state sponsor of terrorism since 1984); *id.* ¶ 104 (Bank Saderat an SDGT as of 2007); *id.* ¶ 109 (Bank Melli designated an SDN as of October 2007); *id.* ¶ 174 ("The Golden Chain document, which identified Al Rajhi's founder and former Chief Executive Officer and Chairman of its Board as a key financier of al-Qaeda, was highly publicized and well-known among the banking community."); *id.* ¶ 176 ("9/11 Commission Report documented the fact that the hijackers used Al Rajhi Bank, the United States designated several Saudi-based nonprofit organizations that were clients of Al Rajhi Bank as terrorist organizations, and Congressional hearings publicized these ties."); *see also id.* ¶ 181 (referencing 2005 indictment alleging that senior officials from al-Haramain Foundation Inc. had cashed $130,000 in American travelers checks at Al Rajhi Bank and then smuggled the money to violent extremists in Chechnya).

terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities."). Plaintiffs also make two specific allegations that HBUS had *actual* knowledge of Al Rajhi Bank's connections to terrorism. Am. Compl. ¶¶ 175, 180. But even those allegations do not meet this standard; they fall well short of asserting that HBUS and HBNA knew they had assumed a role in al-Qaeda's violent activities. *See Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019) (appeal filed). Finally, Plaintiffs also allege that, simply because HBUS and HBNA helped the Banks avoid U.S. sanctions, they "should have known" that their banking services were being used "to facilitate the laundering of funds needed for groups like al-Qaeda to operate." Am. Compl. ¶ 150; *see also* ¶ 38 (alleging that it should have been reasonably foreseeable to the HSBC Defendants that their activities would have facilitated attacks like the one at Camp Chapman). But again, these allegations do not contain facts that plausibly suggest that HBUS and HBNA knew they had assumed a role in terrorism.

But even if Plaintiffs had met the second *Halberstam* element, they do not meet the third. To fulfill the third *Halberstam* element, Plaintiffs must plausibly allege is that HBUS and HBNA "knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477. "As a threshold matter, *Halberstam*'s substantial assistance element requires that [defendants'] assistance be *knowing*." *Honickman ex rel. Goldstein v. BLOM Bank*, 432 F. Supp. 3d 253, 268 (E.D.N.Y. 2020) (emphasis in original). For all the reasons already explained, the Amended Complaint fails to plausibly allege that HBUS and HBNA provided knowing assistance to the suicide attack at Camp Chapman. Plaintiffs allege, at most, that years before the attack, HBUS believed that the Al-Rajhi accounts at issue "may have been used by terrorists." Am. Compl.

13

¶ 175. This is hardly a claim that they knowingly assisted in this attack, carried out by al-Qaeda, by facilitating the transactions at issue.

Finally, even if HBUS and HBNA had the requisite "knowledge," Plaintiffs fail to allege that they "substantially" assisted the Camp Chapman suicide attack. In analyzing this element, the Court considers (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and the (6) duration of the assistance provided. *Halberstam*, 705 F.2d at 484. Because most of the factors strongly favor HBUS and HBNA, the Court finds Plaintiffs have failed to satisfy the "substantial assistance" element.

*The nature of the act encouraged.* The Court first considers the act encouraged to determine "what aid might matter, *i.e.*, be substantial." *Id.* Here, Plaintiffs allege that the relevant act is the suicide attack at Camp Chapman. Am. Compl. ¶ 259.

*The amount and kind of assistance given.* Second, Plaintiffs fail to point to any "assistance" that HBUS and HBNA gave to the Camp Chapman attack. For example, they do not allege that they had any involvement in transactions that the Banks performed directly for, or that directly benefitted, al-Qaeda or others involved in the attack. Although Plaintiffs assert that HBUS and HBNA helped the Iranian Banks circumvent U.S. sanctions and that HBUS provided hundreds of millions of dollars to Al Rajhi Bank, they "do not plausibly allege that [al-Qaeda] received any of those funds or that Defendants knew or intended that [al-Qaeda] would receive the funds." *Kaplan*, 405 F. Supp. 3d at 536. Once again, the closest possible link comes from a 2002 email, in which HBUS posits that the Al-Rajhi accounts "may have been used by terrorists." Am. Compl. ¶ 175. But because the attack did not occur for another seven years, this

14

allegation is too far removed to plausibly assert that HBUS or HBNA used these accounts to finance the Camp Chapman attack or that its assistance caused Plaintiffs' injuries.

*The defendant's absence or presence at the time of the tort.* Third, the parties agree that HBUS and HBNA were not physically present at the suicide attack at Camp Chapman. Still, they were "present" in the sense that, around the time of the attack, HBUS was actively providing financial services to Al Rajhi Bank. *See* Am. Compl. ¶ 161; *Honickman*, 432 F. Supp. 3d at 268–69 (construing the term "presence" broadly to consider whether bank defendant was involved in ongoing business transactions with the banks with alleged ties to terrorism).

*The defendant's relation to the tortious actor.* Fourth, Plaintiffs make no allegations that HBUS and HBNA had any direct relationship with al-Qaeda or Balawi.

*The defendant's state of mind.* Fifth, Plaintiffs make no allegations that HBUS and HBNA knowingly assumed a role in terrorist financing or al-Qaeda's activities generally. In considering this element, the Court should ask if "the defendant was 'one in spirit' with the tortfeasor or 'desire[d] to make the venture succeed.'" *Atchley*, 2020 WL 4040345, at *12 (quoting *Halberstam*, 705 F.2d at 484, 488). Even if Plaintiffs' allegations are enough to plead that HBUS and HBNA knew of the Banks' ties to terrorism and even to al-Qaeda more specifically, they do not allege that HBUS and HBNA had "any intent to further [al-Qaeda's] terrorism." *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 918 (N.D. Cal. 2018). In fact, Plaintiffs undermine any such inference by also alleging that the HSBC Defendants were simply "mesmerized by the potential profits," suggesting that money—and not extremism—was the motivation behind defendants' actions. Am. Compl. ¶ 144.

*Duration of the assistance provided.* Sixth, while Plaintiffs allege that the HSBC Defendants provided banking services in violation of U.S. sanctions beginning in the 1990s and

15

throughout the relevant time in this case, Am. Compl. ¶¶ 133, 161, and that HBUS knew that it was accepting transactions from sanctioned entities as early as June 2000, *id.* ¶ 140, Plaintiffs do not suggest that the length of this banking relationship aided terrorism.

Thus, because Plaintiffs have not adequately pled that (1) HBUS and HBNA knew that by providing financial services to the Banks they were assuming a role in al-Qaeda's terrorism, and (2) their provision of financial services to the Banks knowingly and substantially assisted al-Qaeda's suicide attack at Camp Chapman, the aiding-and-abetting liability claims against them must be dismissed.

### 2. Conspiracy (Count III)

JASTA creates conspiracy liability "for an injury arising from an act of international terrorism," only for "any person . . . who conspires with the person who committed such an act." 18 U.S.C. § 2333(d)(2); *O'Sullivan*, 2019 WL 1409446, at *9.  Thus, JASTA liability exists only where "the secondary tortfeasor [conspired with] the principal tortfeasor in committing '*such an act* of international terrorism.'" *Id.* (quoting *Taamneh*, 343 F. Supp. 3d at 916 (emphasis in original)).  Plaintiffs do not allege that HBUS or HBNA conspired with al-Qaeda or Balawi—"the person[s] who committed such an act of international terrorism." *Freeman v. HSBC Holdings plc*, 413 F. Supp. 3d 67, 95 (E.D.N.Y 2019).  Nor do they allege that those entities that allegedly conspired with HBUS and HBNA—the Banks—had any role in the Camp Chapman suicide attack.  Thus, the Amended Complaint fails to plead a JASTA conspiracy claim. *See id.* at 97–99 (dismissing conspiracy claim because plaintiffs' allegations failed to satisfy the threshold statutory requirement that the HSBC defendants conspired with the person who committed the act of international terrorism).  For this reason alone, Plaintiffs' conspiracy claims must be dismissed against HBUS and HBNA.

But even if Plaintiffs' conspiracy claims could survive this threshold issue, the Amended Complaint fails to allege all the elements of a *Halberstam* conspiracy: (1) an agreement between two or more parties; (2) to participate in an unlawful act; and (3) an injury caused by an unlawful overt act performed by one of the parties; (4) to advance the common scheme. 705 F.2d at 477. In short, "to be subject to secondary liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international terrorism." *O'Sullivan*, 2019 WL 1409446, at *9. And a plaintiff must allege a factual basis "that would lead one to infer that Defendant[s] shared a[] common goal of committing an act of international terrorism." *Kaplan*, 405 F. Supp. 3d at 534.

Plaintiffs argue that these elements are satisfied because HBUS and HBNA allegedly entered into a "terrorist financing" agreement with al-Qaeda. But courts have consistently held that a financial institution's provision of financial services to banks with alleged ties to terrorism is too thin a reed on which to base a claim that the institution "shared the common goal of committing an act of international terrorism." *Id.*; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017) (finding that the plaintiffs failed to plead a bank acted in furtherance of a "common scheme" with al-Qaeda to cause tortious harm to them because "[t]he only conspiracy alleged in the complaint is a conspiracy . . . to defeat U.S. sanctions"), *vacated on other grounds*, 285 F. Supp. 3d 240.

At most, Plaintiffs allege that by illegally providing financial services for the Iranian Banks, HBUS and HBNA joined a conspiracy to evade U.S. sanctions. But "no facts [alleged in the complaint] suggest that [HBUS and HBNA] agreed to facilitate any wrongful conduct beyond this." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018). And even assuming that HBUS and HBNA knew that the United States imposed sanctions against Iran and

17

Al Rajhi Bank because of their connections to terrorism, "Defendants' knowledge of the animating purpose behind U.S. sanctions [does not] support Plaintiffs' assertion that the attacks were a foreseeable consequence of any alleged agreement to evade U.S. sanctions." *O'Sullivan*, 2019 WL 1409446, at *9. At bottom, Plaintiffs do not allege any facts supporting a conclusion that HBUS and HBNA's provision of financial services to the Banks, and those entities' connections to al-Qaeda, "was so coordinated or monolithic that Defendants shared a common purpose or plan with [al-Qaeda]." *Id.* Thus, because the Amended Complaint fails to plausibly allege an agreement to commit an act of international terrorism, Plaintiffs' conspiracy liability claims against HBUS and HBNA must be dismissed as well.

**IV.     Conclusion**

For all the reasons set forth above, the HSBC Defendants' motion to dismiss will be granted. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: November 16, 2020