# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DANA BERNHARDT et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:18cv2739** |
| ) | |
| **ISLAMIC REPUBLIC OF IRAN,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Plaintiffs, Dana Bernhardt et al. (collectively referred to herein as "Plaintiffs"), come now before this Court seeking the entry of default judgment against the Islamic Republic of Iran ("Iran"), and in support thereof state as follows:

## I.      INTRODUCTION

On December 30, 2009, a Jordanian doctor named Humam Khalil al-Balawi ("Balawi") detonated a suicide bomb at a clandestine CIA base in the Khost province of Afghanistan. Balawi, a triple agent with loyalties to al Qaeda, had been invited to Forward Operating Base Chapman ("Camp Chapman") to meet with the CIA in hopes that he would provide crucial information about a leading al Qaeda member. Instead, Balawi executed a meticulously planned attack ("Camp Chapman Attack"). Despite their heroic efforts to stop Balawi, Dane Paresi, a former Green Beret, and Jeremy Wise, a former Navy SEAL, were among the nine killed in the suicide bombing. Their deaths resulted from not only Balawi's malign efforts, but those of his sponsors: al Qaeda,[1] the Taliban, and Iran.

---

[1] Transliteration of the names for foreign organizations has produced various spellings. For ease of reference, "al Qaeda" and "Hezbollah" are used herein as they were in the First Amended Complaint, except where an alternate spelling is reflected in a quoted document or case.

Dubbed the "single deadliest episode" for the CIA since 9/11,[2] Balawi's suicide mission was part of a broader conspiracy to attack America and its allies with acts of international terrorism. To carry out the Camp Chapman Attack, al Qaeda operatives needed extensive assistance. This included the ability to raise, move, and launder funds internationally; the ability to travel freely and without capture across the border of Iran into Afghanistan and Pakistan; the maintenance and funding of the camps in Pakistan where Balawi was trained; the ability of Atiyah al-Rahman, the "engineer" of the Camp Chapman Attack and al Qaeda's emissary to Iran, to move money, facilitators, bomb makers, and operatives into Pakistan; and funding for the communications and training networks that facilitated the development and execution of Balawi's deadly mission.

Iran has historically backed al Qaeda since the 1990's and has facilitated al Qaeda's travel through Iran since at least 2001.[3] In exchange, al Qaeda executes complex attacks that contribute to Iran's goals of creating instability in the region. Up through and even after the Camp Chapman Attack, Iran "serve[d] as the core pipeline through which [al Qaeda] move[d] money, facilitators, and operatives from across the Middle East to South Asia," working with terrorists such as "Atiyah Abd al-Rahman [one of the masterminds behind the Camp Chapman Attack], a key [al Qaeda] leader in Pakistan."[4] By knowingly and intentionally providing material support and resources to enable and assist al Qaeda in carrying out international acts of terror, including the Camp Chapman Attack, Iran is liable for the reasonably foreseeable deaths of Jeremy Wise and Dane Paresi.

---

[2] Alissa J. Rubin and Mark Mazzetti, *Suicide Bomber Killed C.I.A. Operatives*, N.Y. Times, (Dec. 30, 2009), https://nyti.ms/36I1Y41.

[3] U.S. Department of State, *Country Reports on Terrorism 2019: Iran*, https://bit.ly/3vqjCE2 (last visited February 28, 2022); *see* Ex. 1 at 24 ("[t]he travel facilitation that Iran provided to al-Qaeda also helped the terrorist group to execute the 9/11 attacks.")

[4] U.S. Department of the Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://bit.ly/3JMYagk.

Because of its longstanding support for terrorists and its material support of al Qaeda preceding the Camp Chapman Attack, Iran has forfeited its immunity under the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1605A. As the state sponsor, supplier, and trainer for al Qaeda and the Taliban, Iran is liable to Plaintiffs for the extrajudicial killings that devastated these two families.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint in this matter on November 26, 2018. ECF No. 1. The summons was issued on November 28, 2018, ECF No. 4, and Plaintiffs requested service under 28 U.S.C. § 1608(a)(3) on December 6, 2018. ECF No. 7. On November 6, 2019, Plaintiffs filed their First Amended Complaint adding certain banking entities as defendants, ECF No. 10, and the summons to Iran was reissued on November 11, 2019. ECF No. 13. Plaintiffs initiated service of the First Amended Complaint under 28 U.S.C. § 1608(a)(3) on December 12, 2019, ECF No. 21, which was processed by the Clerk's Office on December 18, 2019, ECF No. 25.

After waiting the requisite thirty days, Plaintiffs initiated diplomatic service to Iran pursuant to 28 U.S.C. § 1608(a)(4) on January 24, 2020, ECF No. 29, which was mailed by the clerk on January 30, 2020. ECF No. 31. Iran was formally served on July 14, 2020, and Plaintiffs were notified of service on October 7, 2020. ECF No. 36.

On November 16, 2020, the Court granted HSBC Defendants' Motion to Dismiss. ECF No. 37. Plaintiffs filed an Unopposed Motion for Entry of Final Judgment as to the HSBC Defendants under Rule 54(b) on December 16, 2020. ECF No. 39. The Court granted that Motion on January 28, 2021, allowing for Plaintiffs' case against Iran to proceed during the pendency of the related appeal. ECF No. 41.[5]

---

[5] Plaintiffs filed a Notice of Appeal to the DC Circuit Court on February 25, 2021, ECF No. 42, and oral argument took place on October 18, 2021. No opinion has issued as of the date of this filing.

## III.      LEGAL STANDARD FOR ENTRY OF DEFAULT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. 1608(e). This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003).

"When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) (evidence received via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records"); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (with or without a live evidentiary hearing). Evidence "satisfactory to the Court," 28 U.S.C. 1608(e), may require an evidentiary hearing, but it can also consist of "sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020).

In weighing the evidence, the trial court must consider Congress's stated purpose in enacting § 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *Han Kim*, 774 F. 3d at 1408 (citation omitted), while simultaneously recognizing the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile

sovereign," *Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017). Although "[t]he Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), it should also "accept as true the plaintiffs' uncontroverted evidence" when the foreign state has provided no defense. *See Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007) (accepting "the uncontested evidence and testimony submitted by plaintiffs as true in light of the fact that the defendants in th[e] action have not objected to it or even appeared in th[e] action to contest it").[6]

## IV.   STATEMENT OF FACTS

### A.   Iran's Longstanding Support for International Terrorism

Since the Iranian revolution in 1979, Iran has engaged in and supported terrorism as an explicit instrument of its foreign policy goals. *See* Expert Witness Report of Dr. Daveed Gartenstein-Ross, attached as "Exhibit 1," at 3. Iran's support for terror groups like al Qaeda, Hezbollah, Hamas, and the Houthis is well-documented and longstanding.[7] In the 2021 Congressional Research Service Report on Iran's Foreign and Defense Policies, Iran is listed as the "'leading' or 'most active' state sponsor of terrorism, according to annual State Department records on international terrorism." *Id.* at 3. For this reason, the State Department has designated Iran as a Foreign State Sponsor of Terrorism since 1984.[8]

Iran's support for terrorism is largely carried out under the umbrella of the Islamic Revolutionary Guard Corp ("IRGC"), a paramilitary organization answering directly to the

---

[6] Based on the sworn affidavits attached hereto, *see* Exs. 5–12, Plaintiffs submit that it is reasonable and appropriate for the Court to enter judgment without the need for an evidentiary hearing. If, however, the Court prefers to receive live testimony, Plaintiffs are prepared and willing to proceed.

[7] *See* Kenneth Katzman, *Iran's Foreign and Defense Policies*, Congressional Research Service (Jan. 11, 2021), https://sgp.fas.org/crs/mideast/R44017.pdf (hereinafter "Katzman").

[8] U.S. Department of State, *State Sponsors of Terrorism*, https://bit.ly/3LGVGBZ (last visited February 28, 2022).

Supreme Leader of Iran. Ex. 1 at 23. This Court has previously confirmed that "[t]he IRGC is one of the major organizations through which Iran has historically carried out its support for terrorism" and that "[i]t [ ] has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens." *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 104–105 (D.D.C. 2015), *vacated in part on other grounds by* 190 F. Supp. 3d 138 (D.D.C. 2016). In 2017, the Treasury Department designated the IRGC for sanctions for its role in international terrorism,[9] and the State Department designated the IRGC in April 2019 as a Foreign Terrorist Organization due to its continuing support to numerous proxy groups, including al Qaeda.[10]

Within the IRGC is a specialized branch known as the Qods Force ("IRGC-QF"). The IRGC-QF is primarily focused on foreign operations and has an extensive, well-documented history of supporting terrorism on Iran's behalf.  In recognition of this malign behavior, the U.S. Department of Treasury also designated the IRGC-QF as a Specially Designated Global Terrorist in October 2007, citing its provision of weapons and financial support for "anti-U.S. and anti-Coalition activity in Afghanistan."[11]

Iran, through the IRGC and the IRGC-QF, has intentionally cultivated a relationship with al Qaeda to achieve its own goals in the region. This support has been so pervasive that the Department of State's most recent Country Report on Terrorism indicates that "Iran has allowed AQ facilitators to operate a core facilitation pipeline through Iran since at least 2009," and that it

---

[9] U.S. Department of the Treasury, *Counter Terrorism Designations: IRGC Foreign Terrorist Organization Designation,* https://bit.ly/3BsRq41 (last visited February 28, 2022).
[10] U.S. Department of State, *Foreign Terrorist Organizations*, https://bit.ly/3GWgodc (last visited October 26, 2021).
[11] U.S. Department of the Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct 25, 2007), https://bit.ly/3GYO89Y (last visited February 28, 2022).

remains unwilling to bring senior al Qaeda members to justice or to publicly identify them for accountability.[12]

    **B.**    <u>**Iran's History of Support for al Qaeda**</u>

While the relationship between al Qaeda and Iran is dictated by mutual benefit, the two parties maintain a cooperative relationship that has repeatedly culminated in acts of terrorism. *See Flanagan*, 87 F. Supp. 3d at 104 (finding that "[a]lthough Iranians are Shias, they nevertheless supported the terrorist activities of Bin Laden, a Suni, because of their mutual hatred of 'the infidels in the United States.'"). Iran support for al Qaeda dates back to the early 1990's. In 1991, Ayman al Zawahiri, one of the top leaders of al Qaeda, made a secret visit to Iran to ask for support in overthrowing the Egyptian government. By 1992, al Qaeda and Iranian leaders had formed an alliance to train al Qaeda fighters and funnel funds and operatives through Iranian territory. Ex. 1 at 21. The 9/11 Commission pointed to an informal agreement in late 1991 or 1992 between Iran and al Qaeda for training operatives in campaigns against Israel and the United States. *Id.* The Commission also concluded that the 1998 Embassy Bombings in Nairobi, claiming 224 lives and more than 4,000 injuries, were made possible by the "tactical expertise" provided from this arrangement. *Id.* at 22.

Iran was the "common route" and regarded as "safe passage" for al Qaeda members traveling between Afghanistan and Yemen in the late 1990s and through the year 2000. *Id.* at 23. This Court found Iran liable for the October 2000 suicide bombing attack on the *U.S.S. Cole* for its role in providing "material support and resources . . . to Bin Laden and Al-Qaeda." *Flanagan,* 87 F. Supp. 3d at 116; Ex. 1 at 23. In 2011, the Southern District Court of New York also concluded that Iran provided "material support and resources to al Qaeda for acts of terrorism,

---

[12] Country Reports on Terrorism 2019, *supra* note 3.

including the extrajudicial killing of the victims of the September 11, 2001 attacks." Ex. 1 at 25

(citing *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047,

at 39 (S.D.N.Y. Dec. 22, 2011)).

Following 9/11, Iran provided safe passage, sanctuary, and even special travel papers to

those fleeing Afghanistan after the U.S.-led invasion to oust the Taliban. Ex. 1 at 24–25. While

under Tehran's watchful eye, al Qaeda members under "house arrest" were free to be

"productive member[s] of al Qaeda's leadership." *Id*. at 25. By 2003, the relationship invoked

public concern from U.S. intelligence officials, who stated that "Iran's Ministry of Intelligence

and Security, and the Qods Division of the Islamic Revolutionary Guard Corps . . . are deeply

involved in supporting terrorists, including al Qaeda." *Id*. at 25–26.

With this foundation, al Qaeda's Iran-based network nurtured its central leadership group

in Pakistan, leading to multiple attacks in 2002 and 2003 in Saudi Arabia, Morocco, and Tunisia.

*Id*. at 26. Iran has also orchestrated weapons shipments to al Qaeda through the Afghan Taliban

since at least 2006, including small arms and ammunition, rocket propelled grenades, mortar

rounds, 107 mm rockets, explosively formed penetrators, and plastic explosives like the ones

used in the Camp Chapman Attack.[13]

In 2008, the Treasury Department designated a Bahrain-based al Qaeda operative who

was funneling funds to an al Qaeda facilitator in Iran, and further identified an al Qaeda member

who had traveled to Iran to meet with "senior al Qaeda facilitators" between 2004 and 2007,

courtesy of Iran's latitude to certain al Qaeda operatives. *Id*. at 27. Moreover, the State

Department's 2019 Country Report on Terrorism confirmed that Iran has been providing

continuous "material support for al Qaeda" since the 1990's.[14]

---

[13] Katzman, *supra* note 7, at 4, 8.
[14] Country Reports on Terrorism 2019, *supra* note 3.

C.   **Iran's Support for Al Qaeda in the Camp Chapman Attack**

Balawi, a Jordanian pediatrician and self-proclaimed jihad apologist, carried out the Camp Chapman Attack under al Qaeda's guidance and direction. *Id.* at 39. In early 2009, the Jordanian General Intelligence Directorate ("GID") arrested Balawi after an alert from the U.S. National Security Agency regarding Balawi's substantial presence on jihadist websites. *Id.* The GID worked directly with Balawi to recruit him as a double agent, and Balawi seemingly agreed. *Id.* In May of 2009, Balawi journeyed to Pakistan to meet with members of the Tehrik-e Taliban Pakistan ("TTP"), a coalition of "militant tribesman and extremists," and spent most of the summer there. *Id.* at 31, 39. By August 2009, Balawi was meeting with al Qaeda leaders and reporting back to Jordanian Intelligence. *Id.*

Unbeknownst to the GID and the CIA, Balawi continued to conspire with al Qaeda and the TTP. *Id.* at 39–40. In the days leading up to the Camp Chapman Attack, Balawi and his jihadist handlers prepared diligently to execute the bombing and manage the subsequent media. *Id.* at 40. Through financing provided by Iran, Balawi attended one of the "Ivy League" terrorist training camps in Pakistan owned by al Qaeda and operated in partnership with the TTP. *Id.* at 44 (noting, *inter alia*, publicized statement from the TTP, "[t]hank God that we then trained [Balawi'] and sent him to the Khost air base"). With al Qaeda's support, Balawi recorded videos about the impending attack for release on al Qaeda and TTP media networks. *Id.*

Cognizant of the GID and CIA's great interest in capturing Ayman al-Zawahiri, al Qaeda's second in command, al Qaeda provided Balawi with a staged video signaling Balawi's internal access to key al Qaeda leadership and fostered reports that Balawi would be al-Zawahiri's treating physician. *Id.* at 39–40. This ploy persuaded the agencies to request a meeting with Balawi, setting the stage for one of the deadliest attacks in CIA history. *Id.*

### D.     The Camp Chapman Attack

On December 30, 2009, Balawi arrived at Camp Chapman. *Id.* at 40. Among the team assigned to meet him was his GID handler, several CIA operatives, as well as security contractors Jeremy Wise and Dane Paresi. *Id.* The CIA allowed Balawi's vehicle to bypass external security out of concern for potential Taliban spies at the entrance. Jeremy and Dane objected on security grounds, but they were overruled.[15] As Balawi stepped out of the vehicle, Jeremy and Dane suspected that he intended to detonate an explosive and immediately charged to disarm him.[16] Despite these efforts, Balawi managed to detonate his thirty-pound vest, killing Jeremy, Dane, five other members of the intelligence team, and injuring several more.[17]

## V.     JURISDICTION

### A.     Subject Matter Jurisdiction

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity apply. *See* 28 USC § 1330(a). In this case, Iran is subject to suit under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A, which confers jurisdiction against a foreign government if: (1) the claim is against a designated "State Sponsor of Terrorism"; (2) the victims are nationals or employees of the United States; and (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of such acts. 28 USC §1605A(a)(1)–(2).[18]

The first two elements are straight-forward.

---

[15] *Id.*
[16] *Id.* at 8.
[17] *Id.*
[18] Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran.

Regarding the first element, the Court may take judicial notice of Iran's status as a designated State Sponsor of Terrorism, both at the present time, and when the cause of action arose. *See*, *e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 100 (D.D.C. 2019) (citing 49 Fed. Reg. 2836–02 (Jan. 23, 1984).[19]

Regarding the second element, there is no question as to whether the victims, Jeremy Wise and Dane Paresi, were United States Citizens at the time of the Camp Chapman Attack. 156 Cong. Rec. 297, 329 (2010), attached as "Exhibit 2"; *see* Affidavit of Dana Bernhardt, attached as "Exhibit 5" at ¶ 3; Affidavit of MindyLou Paresi, attached as "Exhibit 7" at ¶ 3.

To establish the third element, Plaintiffs will present evidence of: (a) an act of extrajudicial killing against each victim; (b) committed with the aid of material support from Iran; and (c) that resulted in death. Here, all three are met.

i.   **Jeremy Wise and Dane Paresi were victims of extrajudicial killings.**

The FSIA's terrorism exception defines an extra-judicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extra-judicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73. According to the D.C. Circuit, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment by a regularly constituted court." *Hamen*, 401 F. Supp. 3d at 101 (D.D.C. 2019) (citing *Owens*, 864 F.3d at 770 (2017)). The Camp Chapman Attack satisfies all three elements.

---

[19] State Sponsors of Terrorism, *supra* note 8.

First, Jeremy and Dane were both killed by Balawi's suicide mission. *See* Ex. 2. Both men were among the security personnel at Camp Chapman on December 30, 2009, the date of the attack. *Id*. When Jeremy and Dane realized Balawi's intent to detonate a suicide vest, they immediately attempted to disarm him.[20] Tragically, they never made it. Balawi detonated his vest, armed with thirty pounds of C-4, killing Jeremy, Dane, and seven others.[21]

Second, al Qaeda and its allies acted "deliberately," with "careful consideration," and "not on a sudden impulse" in planning the Camp Chapman Attack. *See Hamen*, 401 F. Supp. 3d at 101–02 (internal citations omitted) (finding that the exception does not require participation of a state actor, only that "the state actor provided material support for an extrajudicial killing committed by a nonstate actor") The Camp Chapman Attack was the result of complex, calculated planning designed to embed Balawi within the CIA. Ex. 1 at 38–40 (discussing multiple plans by the attackers and confirming that "Balawi's allegiance to al-Qaeda and the TTP never wavered"). Specifically, al Qaeda organized production of the video of Balawi seated next to key al Qaeda leaders in a deliberate attempt to "signal to Western intelligence that [Balawi] had succeeded in penetrating the group." *Id*. at 40. Moreover, al Qaeda provided Balawi with details regarding al-Zawahiri's medical condition that corroborated existing intelligence reports, further validating his status as a "double agent." *Id*. This careful planning points to a meticulous and methodical plan to enact extrajudicial killings.

Finally, Balawi's killing was clearly "not authorized by a previous judgment by a regularly constituted court," nor was it "lawfully carried out under the authority of a foreign nation." TVPA, § 3(a); *see Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 74 (D.D.C. 2010) (applying the same test to find that Iran, Hezbollah, and MOIS "in no way acted as a

---

[20] Warrick, *supra* note 17 at 8.
[21] *Id.* at 173.

regularly constituted court and had no authority to authorize such killings" in coordinating a

Beirut bus bombing). The victims were never charged with any crime, but rather, killed to

accomplish an ideological ambition; the TTP claimed responsibility and proclaimed it as revenge

against the Americans "for the killing of Baitullah Mehsud and the killing of al Qaeda's

Abdullah by [sic] CIA." Ex. 1 at 45; *see Letelier v. Republic of Chile*, 488 F.Supp. 665, 673

(D.D.C. 1980) ("Whatever policy options exist for a foreign country, it has no 'discretion' to

perpetrate conduct designed to result in the assassination of an individual or individuals . . . .").

In a general sense, suicide bombings are well-established as "extra-judicial killings." *Goldberg-*

*Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 9 (D.D.C. 2013); *Sisso v. Islamic Republic*

*of Iran*, 448 F. Supp. 2d 76, 85 (D.D.C. 2006); *Wagner v. Islamic Republic of Iran*, 172 F. Supp.

2d 128, 133 (D.D.C. 2001).

Together, this uncontroverted evidence is sufficient to establish that the Camp Chapman

Attack was an act of extrajudicial killing.

### ii. These acts of extrajudicial killings were committed with the aid of material support and resources from Iran.

The relevant definition of "material support or resources" is "any property, tangible or

intangible, or service, including currency or monetary instruments or financial securities,

lodging, training, expert advice or assistance, safehouses, false documentation or identification,

communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . ,

and transportation, except medicine or religious materials." *Hamen*, 401 F. Supp. 3d at 103

(quoting 18 U.S.C. § 2339A(b)(1)).

This Court has previously acknowledged Iranian support to al Qaeda in relation to other

acts of terrorism. For example, in the bombing of the *U.S.S. Cole* on October 12, 2000, the Court

found that "the record supports a finding that the Iranian and Sudanese defendants conspired to

support Al-Qaeda," and that "Iran took primary responsibility for transferring, via Lebanese Hizballah, extensive technical expertise to Al-Qaeda and other terrorist organizations." *Flanagan*, 87 F. Supp. 3d at 116–117. Likewise, in *Opati v. Republic of Sudan*, the Court recognized that Iran had "a long history of providing material aid and support to terrorist organizations including al Qaeda, which has claimed responsibility for the August 7, 1998 embassy bombings." 60 F. Supp. 3d 68, 74 (D.D.C. 2014).

The Camp Chapman Attack was yet another intended product of Iranian support to al Qaeda and its allies. Plaintiffs have retained Dr. Daveed Gartenstein-Ross to testify as an expert witness regarding Iran's material support to the terrorist groups organizing the Camp Chapman Attack. Given the evidentiary challenges typically facing plaintiffs in terrorism cases, expert reports such as Dr. Gartenstein's "can be of critical importance." *Owens*, 174 F. Supp. 3d at 276. Dr. Gartenstein-Ross has dedicated his professional life to studying the role of these violent non-state actors and specializes in designing solutions to combat their effects in society.

Dr. Gartenstein-Ross holds a Ph.D. and M.A. in World Politics from the Catholic University of America, a J.D., *magna cum laude*, from New York University School of Law, and a B.A. with Honors, *magna cum laude*, from Wake Forest University. Ex. 1 at 5. He is the author or volume editor of twenty-seven books and monographs and has written extensively for peer-reviewed academic publications and the press on matters related to militant groups and violent non-state actors. *Id*. at 8. He has served as a Subject-Matter Expert to numerous organizations, including to the Global Counterterrorism Forum, the United States Department of Defense Joint-Improvised-Threat Defeat Organization, and the United States Customs and Border Protection. *Id*. at 5–6. As part of these efforts, Dr. Gartenstein-Ross has provided strategic reports on the activities of al Qaeda and developments in Afghanistan. *Id*. at 5.

Dr. Gartenstein-Ross is also the Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies (FDD), an Associate Fellow at the International Centre for Counter-Terrorism – The Hague (ICCT), and the Chief Executive Officer of his own private commercial firm, Valens Global. *Id*. at 4. His past positions include service as Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships, and as a Fellow at Jigsaw, a threat-prevention think tank within Google. Dr. Gartenstein-Ross has also been court-certified to testify as an expert witness on multiple terrorism cases involving activities of al Qaeda, the Taliban, and ISIS, among others. *Id*. at 6–7. The Fourth Circuit recognized Dr. Gartenstein-Ross' "extensive credentials and areas of expertise" and affirmed his capability to serve as an expert witness. *Id*. at 7.

In his expert report, Dr. Gartenstein-Ross ultimately concludes that Iran provided material support directly to al Qaeda and the TTP, and that this support empowered the planning and facilitation of the Camp Chapman Attack. *Id*. at 46–50. Iran's aid ran the gamut of "material support" as defined in 18 U.S.C. § 2339A(b)(1)), including currency, lodging, training, expert advice or assistance, safehouses, facilities, weapons, explosives, personnel, and transportation. As a foreseeable result of this support, al Qaeda was able to execute the Camp Chapman Attack.

To illuminate this relationship, Dr. Gartenstein-Ross traces Iran's material support to these groups through the emergence and evolution of al Qaeda and its relationship with the TTP and the Haqqani Network. *Id*. at 16–38. He explains how aid to these particular groups allows Iran to achieve its most fundamental foreign policy goals, "while retaining a degree of plausible deniability." *Id*. at 3. These findings are sufficient to prove that Iran provided material support and resources towards the Camp Chapman Attack.

1.      *Iranian Support to Al Qaeda*

As explained above, *see supra* Section IV.B, Iran has a history of materially supporting al

Qaeda with funding, training, explosives, and "expert advice or assistance" since the 1990's. *See*

18 U.S.C. § 2339A(b)(1). During Osama bin Laden's short stay in Sudan in 1991, he reached out

to Iran for assistance in developing his "true global terrorist network." Ex. 1 at 20. Both Iran and

its "gold standard" proxy group, Hezbollah, agreed to help. *Id.*; *Hamen*, 401 F. Supp. 3d at 93

(confirming that "Hezbollah is today regarded as the "gold standard" for what Iran hopes to

achieve with proxy militias in Afghanistan, Syria, Iraq, and Yemen."). After this, Dr. Ayman al-

Zawahiri, one of bin Laden's early confidants, "reportedly visited Iran in the early 1990's and

secured an agreement in which Tehran provided $2 million in funding, as well as training for

Egyptian Islamic Jihad ("EIJ") operatives, for operations against President Hosni Mubarak's

regime in Egypt." Ex. 1 at 21.

David S. Cohen, the U.S. Under Secretary for Terrorism and Financial Intelligence,

confirmed the existence of this longstanding conspiracy in a 2011 press release: "[B]y exposing

Iran's secret deal with [al Qaeda] allowing it to funnel funds and operatives through its territory,

we are illuminating yet another aspect of Iran's unmatched support for terrorism … [Iran was] a

critical transit point for funding to support [al Qaeda's] activities in Afghanistan and Pakistan."[22]

Through Hezbollah, Iran provided explosives and training for al Qaeda and the EIJ,

including instructions on how to blow up "big buildings." Ex. 1 at 21. The 9/11 Commission

later concluded that the 1998 Embassy Bombings were made possible by this same type of

"tactical expertise" provided from an arrangement between Iran and al Qaeda operatives in the

early 1990's. *Id.* at 22.

---

[22] U.S. Department of the Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point*, (Jul. 28, 2011), https://bit.ly/3JMYagk.

Iran has streamlined al Qaeda's ability to move money, weapons, supplies, and personnel across state lines. *Id*. In 2018, the U.S. State Department declared that "Iran has allowed AQ facilitators to operate a core facilitation pipeline through Iran since at least 2009, enabling AQ to move funds and fighters to South Asia and Syria." *Id*. at 29. To wit, in a 2007 letter that was subsequently released by the Treasury Department in reference to its designation of international sanctions, bin Laden described Iran as al Qaeda's "main artery for funds, personnel, and communication." *Id*. at 49. With Iran's substantial support, al Qaeda operatives positioned themselves to plan further attacks after 9/11, including the suicide bombing at Camp Chapman.

2.     *Iranian Support to the Tehrik-e Taliban Pakistan*

Iran purposefully distributes its support among various groups. *See Id*. at 50. In addition to direct support to al Qaeda, Iran enabled the productive relationship between al Qaeda and the TTP, a relationship that was "essential to the Camp Chapman operation."  *Id*. at 3, 35, 49 ("Al-Qaeda and the TTP are directly responsible for the attack on Camp Chapman.").

The U.S. State Department describes the relationship between the TTP and al Qaeda as a "symbiotic relationship." *Id*. at 32. In this way, the TTP offers a "safe haven" along the Afghan-Pakistani border for al Qaeda members in exchange for "ideological guidance" and "access to al-Qaeda's global terrorist network and the operational experience of its members." *Id*. Some TTP leaders and members are "dual-hatted al-Qaeda operatives." *Id*. at 34. The TTP often coordinates its attacks with other terrorist groups, including the Afghan Taliban and al Qaeda. *Id*. at 32.

In the timeframe leading up to the Camp Chapman Attack, the United States attributed at least two major attacks to al Qaeda's collaboration with the TTP, including the 2007 assassination of the former Pakistani prime minister Benazir Bhutto and the 2008 bombing of the Marriott Hotel in Islamabad. *Id*. at 37–38. Atiyah Abd al-Rahman – the "engineer" of the Camp

Chapman Attack – played a prominent role in helping al Qaeda engage with the TTP. *Id*. at 48.

As Dr. Gartenstein-Ross explains, Iran's support to Atiyah equipped both al Qaeda and the TTP

in executing the Attack. *Id*. at 35. Moreover, both al Qaeda and the TTP cultivated strong

connections to the Haqqani Network, leading Dr. Gartenstein-Ross to conclude that the Haqqani

Network was also "partly liable for the attack." *Id*. at 41.

> 3.     *Iran's material support of terrorist groups, including al Qaeda and TTP, was a proximate cause of the Camp Chapman Attack.*

The FSIA's terrorism exception requires a showing of proximate cause. *Selig v. Islamic*

*Republic of Iran*, No. 1:19-CV-02889-TNM, 2021 WL 5446870, at *10 (D.D.C. Nov. 22, 2021)

(citing *Owens*, 864 F.3d at 798). "Proximate cause requires some reasonable connection between

the act or omission of the defendant and the damage which the plaintiff has suffered." *Id*. A

"reasonable connection" is established where two factors are met: (1) "the defendant's actions

[were] a substantial factor in the sequence of events that led to [their] injury," and (2) where the

injury was "reasonably foreseeable or anticipated as a natural consequence of the defendant's

conduct." *Id*. The FSIA does not require "careful bookkeeping" of the use of material support, so

long as Plaintiffs demonstrate that Iran's financial and military aid to the terror group "played a

significant role in aiding its operational capacity." *Id*. (citing *Schwartz v. Islamic Republic of*

*Iran*, Case No. 1:18cv1349, 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020)).

It is Dr. Gartenstein-Ross's professional opinion that because of "the nature and extent of

Iranian material support to al-Qaeda, which among other things helped al-Qaeda to forge its

cooperative relationship with the TTP, Iran's assistance bore a definite connection to the attack

on Camp Chapman," *Id*. at 51, resulting in the deaths of Jeremy and Dane. He concludes that

there are several causal connections between Iranian support and the Camp Chapman Attack, and bases this opinion on the following facts and analysis:

First, Iran equipped al Qaeda with necessary resources following 9/11, such as providing the "time and space it required to recover, regroup, and rebuild its organization . . . ." *Id*. at 47. By providing safe passage and sanctuary to numerous high-ranking al Qaeda operatives, Iran was able to keep these top operatives within their sphere of influence "to identify how this group could best be used to advance the Iranian regime's objectives . . . ." Indeed, this environment allowed al Qaeda members in Iran to create a management council that communicated with operatives in Pakistan to execute further attacks. *Id*.

Second, Iran's provision of sanctuary to Atiyah Abd al-Rahman, the "engineer" of the Camp Chapman Attack, served a critical role in the execution of the Attack. *Id*. at 48. Following 9/11 and "with Iran's support," Abd al-Rahman rose to such prominence within al Qaeda that when he appeared in the 2009 video Balawi presented to the GID and CIA he was "instantly recognizable to the agency's counterterrorism experts, even though no American officer had seen the man in eight years". *Id*. (quoting *Warrick*, supra). Infamously known as one of the closest, living associates of Osama bin Laden, Abd al-Rahman's strategic inclusion in the video next to Balawi was designed to encourage CIA officials to agree to meet Balawi. *Id*. Iran's support was "essential" to Atiyah's position of influence within al Qaeda and in his "decisive role" in the planning of the Camp Chapman Attack, featuring himself as bait. *Id*. at 48–49.

Third, Iran provided Abd al-Rahman with a unique level of mobility between Iran and Pakistan, where the planning for the Camp Chapman Attack occurred. *Id*. at 49. In 2011, the Treasury Department disclosed his status as al Qaeda's emissary to Iran, a position that required liberal ingress and egress to and from Iran. *Id*. Consistent with Iran's long history of providing

travel facilitation to al Qaeda, Atiyah's position as al Qaeda's emissary to Iran and regular trips out of Iran "with the permission of Iranian officials" facilitated al Qaeda's ability to move operatives as needed to plan and execute attacks. *Id.*

Fourth, Iran provided al Qaeda, and Abd al-Rahman specifically, with the freedom to develop a relationship with the TTP that was "essential to the Camp Chapman operation." *Id.* at 50. Abd Al-Rahman provided "ideological, legal, and theological guidance and criticism" to senior members of the TTP from the time of its founding until his death in 2011 and lived in TTP-controlled territory while planning the Camp Chapman Attack. *Id.*

Finally, Iran's provision of a "core pipeline" allowed al Qaeda to move funds, personnel, supplies, weapons, and communications from the Middle East to South Asia, and specifically from Iran to al Qaeda members in Pakistan. *Id.* Ezedin Abdel Aziz Khalil, an al Qaeda financier based in Iran, "collected funding from various donors and fundraisers throughout the Gulf," moved "significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq," and "facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran." *Id.* The Treasury Department revealed details of this agreement between Iran and al Qaeda in press releases from 2011 and 2012 sanctioning Khalil and other al Qaeda operatives for their roles in operating this core pipeline. *Id.*

In sum, Dr. Gartenstein-Ross opines that "Iran has used these groups to launch attacks on U.S. forces, including in the Afghanistan theater, while retaining a degree of plausible deniability," and as a result, "Iran's assistance bore a definite connection to the attack on Camp Chapman." *Id.* at 3, 50–51. Given Iran's significant and longstanding provision of, *inter alia*, lodging, training, expert advice or assistance, safehouses, facilities, weapons, explosives, personnel, and transportation to al Qaeda before, during, and after the Camp Chapman Attack,

these findings are sufficient to constitute the provision of material support as defined in 18 U.S.C. § 2339A(b)(1).

### iii.        The Camp Chapman Attack resulted in death.

As articulated above, *see supra* Section V.A.i, Jeremy and Dane's deaths are established through the uncontroverted testimony of survivors and Congressional Records confirming their presence that day. Ex. 2 at 329. On January 20, 2010, the House of Representatives named and honored Jeremy and Dane as among those who lost their lives in the Camp Chapman Attack. *Id*.

Because Plaintiffs' claims against Iran satisfy each element of FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(a)(1), Iran is not protected by the doctrine of sovereign immunity in this matter. Therefore, this Court has subject matter jurisdiction over Plaintiffs' claims for relief. *See* 28 U.S.C. § 1330(a).

### B.        <u>Personal Jurisdiction</u>

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). The preceding section lays out the basis for satisfaction of the first element on subject matter jurisdiction. The second element for personal jurisdiction is also satisfied because Iran was properly served, as described below.

Title 28, Section 1608 prescribes the four methods of obtaining proper service in FSIA cases. *See* U.S.C. § 1608(a)(1)–(4). These methods must be attempted in ascending order, but only to the extent that each is feasible in a specific case or applicable to a specific defendant. *Id.* The first two methods of service under Section 1608—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention," respectively—do not apply here, as Plaintiffs have no "special arrangement" for

service with Iran and Iran is not party to "any applicable international convention on service of judicial documents." *See Valore*, 700 F. Supp. 2d at 70; *Schwartz*, 2020 WL 7042842, at *15.

Plaintiffs initiated the third method of service, via foreign mailing pursuant to 28 U.S.C. § 1608(a)(3), on December 12, 2019. ECF No. 21. The Clerk initiated service in this manner on December 18, 2019. *See* ECF No. 25. After waiting the requisite thirty days, without success, Plaintiffs initiated the final method of service, in accordance with 28 U.S.C. § 1608(a)(4), on January 24, 2020. ECF No. 29. On January 30, 2020, the Clerk transmitted those documents to the U.S. State Department for service through diplomatic channels. ECF No. 31. The State Department subsequently confirmed that the Iranian Ministry of Foreign Affairs was served with the pleadings on July 14, 2020. ECF No. 36. Iran failed to respond to the First Amended Complaint and Plaintiffs requested entry of default on April 15, 2022. ECF No. 45. The Clerk entered default as to Iran later that same day. ECF No. 46.

Iran is outside the protection of sovereign immunity, *see supra* Section V.A, and, as explained in this section, Plaintiffs have fully complied with the service requirements of Section 1608(a). With those two elements satisfied, this Court may properly exercise personal jurisdiction over Iran in this matter. *See* 28 USC § 1330(b).

## VI.        THEORIES OF LIABILITY

Statutory liability in FSIA cases is traditionally determined in one of two ways: (1) by simply proving the elements necessary to satisfy the federal cause of action established by Congress in Subsection (c) of Section 1605A; or (2) by analyzing those same 1605A(c) elements, but then also showing compliance with some specific common law theory of recovery as articulated in the Restatement of Torts. Plaintiffs suggest that the first method is sufficient and

the most straightforward, but both approaches have been widely used to determine a foreign

state's liability for sponsoring acts of terrorism.[23]

Plaintiffs will address both approaches to analyzing FSIA liability below, first for the

claims on behalf of the deceased victims and then for the surviving family member claims.

A.    **Iran's Liability for the Death of Victim Plaintiffs**

"There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action

and the terrorism exception to foreign sovereign immunity." *Id.* at 86–87, *quoting Foley v.

Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017). For all intents and purposes, an

American citizen plaintiff who proves the requirements for a waiver of sovereign immunity

under 28 U.S.C. §1605A(a) "has also established entitlement to relief as a matter of federal law."

*Fritz,* 320 F. Supp. 3d at 87.

Those 1605A elements—that: (1) Iran was designated as a state sponsor of terrorism; (2)

Jeremy and Dane were American citizens at the time of their deaths; and (3) money damages are

sought for deaths caused by extrajudicial killings and the material support of such acts—are the

same under both the sovereign immunity waiver and the liability sections of the statute.

Accordingly, the analysis need go no further, and the Court may find that the estates of Jeremy

and Dane ("the Victim Plaintiffs") are entitled to recovery under federal statutory liability,

pursuant to 28 U.S.C. § 1605(c) for the same reasons described above. See *supra* at Section V.A.

---

[23] Historically, in its original form, the FSIA terrorism exception was not interpreted to create a federal cause of action, but rather to operate only as a "pass-through" for other claims. *See Owens,* 864 F.3d at 809; *Fritz v. Islamic Republic of Iran,* 320 F. Supp. 3d 48, 89 (D.D.C. 2018). But that law was amended as part of the National Defense Authorization Act in 2008 to explicitly authorize an independent federal cause of action, but this amendment "did not upset the prior law permitting plaintiffs to assert state law claims after clearing the hurdle of foreign sovereign immunity." *Fritz,* 320 F. Supp. 3d at 89, *citing Owens,* 864 F.3d at 807–09. Accordingly, FSIA cases may still decided by simply using Section 1605A as the method for by-passing subject matter jurisdiction, and then drawing the substantive claims from state or foreign law. But this is necessary only when the victims, or their family members, are not United States nationals, which is not the case here.

Although meeting the elements laid out in 1605A(c) appears to be sufficient to establish liability under the federal cause of action, some courts have gone one-step further to also analyze FSIA claims in comparison to the elements of basic common law torts. Should the Court wish to proceed in that manner here, the facts alleged concerning the deaths of the Victim Plaintiffs also meet common law tort standards for assault and battery.

### i. Assault

A defendant is liable for assault when it acts "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact with those attacked and those attacked were thereby put in such imminent apprehension." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) (quoting RESTATEMENT (SECOND) OF TORTS § 21(1)) (internal quotation marks omitted). In *Braun*, the Court considered assault in the context of acts of terror, finding that the very definition of terrorism involved "the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal." *Id.* (citing Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism). This, combined with the plaintiff's testimony that "she felt and continues to feel anxiety as a result of the [bombing] attack," was enough to satisfy the elements for assault. *Id.*

Here, Iran's lethal support for al Qaeda and its allies, and the very nature of this attack—a suicide bombing—clearly exemplifies the desire to "cause harmful or offensive contact" to citizens and employees of the United States government. *See id.* Sources also indicate that both Jeremy and Dane leapt to action once they realized that Balawi intended to detonate his vest, demonstrating their awareness of imminent harm.[24] Therefore, the Victim Plaintiffs would recover under the general principles of tort law for a claim for assault.

---

[24] Warrick, *supra* note 15 at 172.

ii.        **Battery**

A claim for battery is similar to one for assault, except that "a harmful contact" must "directly or indirectly result[]." *Braun*, 228 F. Supp. 3d at 80 (quoting RESTATEMENT (SECOND) OF TORTS § 13). Something amounts to "harmful contact" when it results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 15). Because the bombing killed both Jeremy and Dane, a "harmful contact" is clearly established. *See* Ex. 2. These fatal physical contacts permit the Victim Plaintiffs to successfully advance claims under a battery theory.

Because the Victim Plaintiffs meet the three Section 1605A(c) elements, and their claims can be expressed consistently with accepted principles of common law torts for assault and battery, the Court should find in favor of the Victim Plaintiffs as to liability.

B.        <u>Iran's Liability to the Family Member Plaintiffs</u>

The remaining plaintiffs identified in the First Amended Complaint are the immediate family members of Jeremy and Dane ("Family Member Plaintiffs"). *See* ECF No. 10 at ¶¶ 1–10. Immediate family members who are U.S. citizens fall within Section 1605A(c)'s private cause of action with the same "total overlap" with the sovereign immunity analysis as the elements analyzed above. *Fritz,* 320 F. Supp. 3d at 86-87. The Family Member Plaintiffs satisfy those elements in the same manner as their deceased loved ones. All that is then left to establish is the existence of the family relationship at the time of the Camp Chapman Attack, which is done through the attached affidavits. *See* Exs. 5-12. With such familial relationships proven through

uncontroverted sworn written testimony, these claims are wholly derivative of the Victim Plaintiffs and should be granted.

Some courts have also required a showing that "the substantive bases for liability" for family members are provided by "general principles of tort law." *Braun,* 228 F. Supp. 3d at 78. If this Court wishes to further analyze these claims in this manner, the Family Member Plaintiffs submit that their evidence also meets elements for intentional infliction of emotional distress as set forth in the RESTATEMENT (SECOND) OF TORTS. *Id.*

A defendant is generally liable for intentional infliction of emotional distress if it, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to the plaintiffs." *Id.* at 81 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)) (internal quotation marks omitted). The nature-of-the-act element is satisfied in the Camp Chapman Attack because "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C.2009).

By the same token, providing material support by means of weapons, funding, and training, particularly to a terrorist organization like al Qaeda, is extreme and outrageous. *See Braun*, 228 F. Supp. 3d at 81 (finding defendant's conduct in materially providing support to a terrorist organization was "sufficiently outrageous and intended to inflict severe emotional harm"). Moreover, these acts did in fact cause severe emotional distress to the Family Member Plaintiffs. *See, e.g.,* Ex. 5 at ¶¶ 12, 19–37, 47–53; Ex. 6 at ¶¶ 12–21, 34, 40–41; Ex. 7 at ¶¶ 8–16; Ex. 8 at ¶¶ 10–25; Ex. 9 at ¶¶ 8–9, 13–29, 34–35; Ex. 10 at ¶¶ 10–16; Ex. 11 at ¶¶ 7–8; Ex. 12 at ¶¶ 14–16.

The emotional toll on the Family Member Plaintiffs includes not just the mental anguish from learning of the attack, which can be presumed, but also the negative impact from the Victim Plaintiffs' death on the surviving family members. Those impacts are detailed in the attached affidavits and summarized in Section VII below.

Furthermore, it bears noting that the fact that the Family Member Plaintiffs were not present for the December 30, 2009 attack would not block their claims. *See Valore*, 700 F. Supp. at 80 (plaintiffs "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result") (internal citations omitted). Iran, through its provision of material support to al Qaeda and its allies, purposefully advanced violent acts of terrorism with "the intent to create maximum emotional impact, particularly on third parties." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009). With this in mind, "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." *Salazar*, 370 F. Supp. 2d at 115.

Consistent with the persuasive precedent from this District and the general principles of tort law cited above, the Family Member Plaintiffs may recover under Section 1605A(c) and have successfully articulated a theory of recovery consistent with the common law principles of intentional infliction of emotional distress.

## VII.    DAMAGES

The FSIA terrorism exception specifies that Plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages." *See* 28 U.S.C. § 1605A(c); *see Valore*, 700 F. Supp. 2d at 82–83 (stating that ". . . estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for

their emotional injury; and all plaintiffs can recover punitive damages"). Each of these types of recovery will be addressed below.

### A. <u>Pain and Suffering</u>

Courts routinely award pain and suffering damages to the estates of victims who are killed as a result of terrorist activity so long as the death was "anything but instantaneous." *See Worley v. Islamic Republic of Iran*, 177 F. Supp. 3d 283, 286 (D.D.C. 2016). The critical inquiry "is whether the victim suffered 'conscious pain' for some period of time." *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 259 (D.D.C. 2014). However, this Court has also found that "[i]n the absence of evidence tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter . . . an award of pain and suffering is inappropriate." *Worley*, 177 F. Supp. 3d at 286.

Although Plaintiffs initially requested damages for pain and suffering in their pleadings, further review of the relevant caselaw has revealed that pain and suffering damages appear to be inappropriate for the facts at hand. Reports generally indicate that, due to their proximity to Balawi and the explosion, Jeremy and Dane were killed instantly upon detonation of the suicide vest. *See* Ex. 1 at 41 ("[t]he explosion immediately killed Balawi, his driver, both Wise and Paresi, and several of the intelligence professionals standing nearby."). Therefore, Plaintiffs withdraw their initial prayer for an award of pain and suffering damages.

### B. <u>Economic Losses</u>

Economic damages are available to victims of terrorism in the form of lost wages and diminished earning capacity. Such damages are also available to the estates of deceased victims as compensation to their families for the loss of economic support. In FSIA cases, "[t]he report

of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed,* 845 F. Supp. at 214.

Plaintiffs retained economists Chad L. Staller, JD, MBA, MAC, CVA and Stephen M. Dripps, M.Fin., CVA from The Center for Forensic Economic Studies to determine the loss of economic support resulting from Jeremy and Dane's deaths. Mr. Staller and Mr. Dripps are forensic economists with substantial academic credentials and extensive experience qualifying as experts. They have provided reports determining the loss of economic support to the Wise and Paresi families. *See* Expert Affs. Center for Forensic Economic Studies (hereinafter "Exhibit 3" regarding Jeremy Wise and "Exhibit 4" regarding Dane Paresi).

### i.     Lost income for the Estate of Jeremy Wise

Mr. Staller and Mr. Dripps provided their expert opinions regarding the loss of economic support to the Estate of Jeremy Wise as a result of his untimely death. They assumed an average life expectancy, an average Healthy Life expectancy, and an average worklife expectancy, leading to a remaining work-life of 27.7 years. Ex. 3 at 2. Their calculations included Jeremy's intent to resume medical school and work as a physician upon his return from overseas empolyment. *Id*. at 2–3. Jeremy's anticipated lifetime income was increased to account for fringe benefits, future growth, and lost household services, and then decreased to account for income taxes, personal maintenance, present value, and consumer price index statistics. *Id*. at 3–6.

Based on that analysis, Mr. Staller and Mr. Dripps totaled the lost income for the Estate of Jeremy Wise at \$3,677,674. *Id*. at 6.

### ii.     Lost income for the Estate of Dane Paresi

Mr. Staller and Mr. Dripps also provided their expert opinions regarding the loss of economic support to the Estate of Dane Paresi. They assumed an average life expectancy, an

average Healthy Life expectancy, and an average work-life expectancy. Ex. 4 at 2. Two worklife estimates were offered: 15.8 years assuming Dane's statistical worklife expectancy, and 20.8 years assuming a continuous worklife to his Social Security retirement age. *Id*. at 2. They based their calculations on Dane's employment records, his average annual pay, military pension benefits, and Veteran's Affairs disability benefits. *Id*. Dane's anticipated lifetime income was increased to account for fringe benefits, future growth, and lost household services, and then decreased to account for income taxes, personal maintenance, and present value. *Id*. at 3–5.

Based on that analysis, Mr. Staller and Mr. Dripps determined that the total economic loss ranges between $2,525,321 to $2,835,747. *Id*. at 6. Plaintiffs submit that adoption of the longer worklife expectancy is appropriate and reasonable, based on the professional opinion of Mr. Staller and Mr. Dripps, and therefore request an award of $2,835,747 in lost income for the Estate of Dane Paresi.

### C.   Solatium Damages

The Family Member Plaintiffs each advance a claim for solatium damages pursuant to Section 1605A(c). Those "in direct lineal relationships are presumed to suffer damages for mental anguish insofar as '[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.'" *Bova v. Islamic Republic of Iran*, Case No. 1:15cv1074, 2020 WL 2838582, at *6 (D.D.C. May 31, 2020) (quoting *Belkin*, 667 F. Supp. 2d 8, at 22). These damages, however, are not easily quantifiable, so "[c]ourts look for guidance, therefore, in prior decisions." *Id.*

Solatium claims are generally defined as compensation for "mental anguish, bereavement and grief." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011). A solatium claim is "nearly indistinguishable from a claim for IIED." *Flanagan*, 87 F. Supp. 3d at 115. In

*Heiser*, this Court developed a standardized approach for calculating solatium damages that was based upon past cases. 466 F. Supp. 2d 229, 269 (D.D.C. 2006). Where the victim was killed by a terrorist act, *Heiser* suggested awards of eight million dollars for spouses, five million dollars for children and parents, and two million five hundred thousand dollars for siblings. *Id.*

Although the *Heiser* framework is widely recognized as the presumptive approach, its suggested figures "are not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). This Court has discretion "to grant solatium awards based on the particular facts of each case." *Blank v. Islamic Republic of Iran,* No. 1:19cv3645 (BAH), 2021 WL 3021450, at *12 (D.D.C. July 17, 2021) (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 351 (D.C. Cir. 2018))*.* Upward departures are merited when plaintiffs show "an especially close relationship" with the victim, "medical proof of severe pain, grief or suffering on behalf of the claimant," or circumstances that made the "suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27. Upward departures are also appropriate where the victim's death was "sudden and unexpected," rendering the "shock and grief suffered by family members 'all the more intense.'" *Id.* at 28–29 (quoting *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 90 (D.D.C. 2002)). Extensive media coverage and exposure to gruesome images can "compound" grief, causing severe emotional distress. *See Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 157 (D.D.C. 2019) (where the victim's "death and attack were covered intensely by the media," exposing family members to "multiple images of [victim's] dead body").

### i.       The Wise family

The Wise family plaintiffs include Jeremy's widow, Dana Bernhardt ("Dana"), his stepson Ethan Prusinski ("Ethan"),[25] his mother Mary Lee Wise ("Mary Lee"), and his sister

---

[25] Listed on the First Amended Complaint as "E.P.," Ethan has since become a legal adult.

Mary Heather Wise ("Mary Heather"). Dana and Ethan had a particularly strong reliance upon Jeremy, not only financially as their primary source of income, but also physically and emotionally. *See* Ex. 5 at ¶¶ 9–10. Similarly, Jeremy's parents and siblings depended on Jeremy for significant emotional and relational support. *See, e.g.*, Affidavit of Mary Heather, attached as "Exhibit 6" at ¶¶ 4–9, 18, 41. The repeated media coverage of the bombing only intensified this suffering, as the Attack was widely dissected at the national level, forcing them to relive their trauma at unexpected moments even years after the incident. *See* Ex. 5 at ¶¶ 31–33.

For Dana, Jeremy was her "best friend" and the "one constant" in her life. Ex. 5 at ¶ 4. Dana and Ethan relied on him for their financial and emotional support. *Id.* at ¶¶ 6–10. As the breadwinner, Jeremy "provided for Ethan and [Dana] completely." *Id.* at ¶ 44. Jeremy was in his second year of medical school at the University of Arkansas before the attacks of September 11, 2001 spurred him to enlist in the Navy. *Id.* at ¶ 11; Ex. 3 at 2. He intended to resume his medical program upon discharge and continue to provide for his family as a physician. *Id.* Jeremy was a devoted father and husband and shared an incredibly strong bond with Dana. Ex. 5 at ¶ 6. ("When Jeremy wasn't working, he spent all his time with Ethan and me. We were together all the time."). Dana "always wanted to be around him," and they would spend hours talking together. *Id.* at ¶¶ 6–7.

Dana saw Jeremy for the last time on December 4, 2009, when she dropped him off at the airport. *Id.* at ¶ 12. The night of his death, they were instant messaging; but later that evening, officers informed Dana that Jeremy had died in a suicide attack and that there was no body. *Id.* at ¶¶ 14–15. Because of the severity of the bombing, only pieces of Jeremy's remains were available for burial. *Id.* at ¶¶ 23–24. Rather than being able to say a peaceful goodbye to Jeremy

in her few moments alone with the casket before the funeral, Dana was instead overwhelmed by the "horrific" smells of her husband's remains. *Id.* at ¶ 23.

Following Jeremy's death, Dana sought treatment from a counselor for depression, elevated stress, and anxiety. *Id.* at ¶¶ 26–27. More than a decade later, Dana continues to grieve. *Id.* at ¶ 27. She was recently diagnosed with Post-Traumatic Stress Disorder and prescribed antidepressants after suffering several panic attacks. *Id.* Dana continues to have night terrors, and often wakes up "dry heaving and pulling muscles" from her ribs. *Id.* at ¶ 28. Moreover, the high-profile nature of Jeremy's death intensified Dana's grief. She was urged to attend several memorials over the years, resulting in "weeks of exhaustion and mental fog" following each event. *Id.* at ¶ 30. Each new depiction of the Camp Chapman Attack exacerbated the grieving process. *Id.* at ¶¶ 31–33. While attending a different film at the movie theater, a preview for *Zero Dark Thirty*[26] appeared on the screen, causing her great mental and physical distress as her "heart raced" and she felt like she "couldn't breathe." *Id.* at ¶ 31. The United States' recent withdrawal from Afghanistan resulted in further unsolicited reminders about Jeremy's death. *Id.* at ¶ 33.

Ethan was Jeremy's stepson, but Jeremy considered Ethan the equivalent of his own biological child. *Id.* at ¶ 45 ("There was no biological distinction to Jeremy"). Jeremy always referred to Ethan as "my son," and Ethan called Jeremy "Dad." *Id.* at ¶¶ 41, 45. Jeremy would counsel Ethan on "how to be a good young man," paid for all his expenses and education at a private school, and listed Ethan as a dependent on his military documents. *Id.* at ¶¶ 42, 44. They had an "inseparable" bond and spent "countless hours of time together" riding bikes, fishing, or going to the park to play. *Id.* at ¶¶ 40-41.

---

[26] The 2012 film *Zero Dark Thirty* includes a cinematic depiction of the suicide bombing at issue in this matter.

Ethan was six years old when Jeremy was killed. *Id.* at ¶ 47. In the months following, he would sleep in his mother's bed, wearing Jeremy's jacket. *Id.* at ¶ 48. Ethan's room evolved into a living memorial for his deceased father, filled with "folded flags, medals of honor, pictures, and SEAL trident pins all over his room." *Id.* at ¶ 51. Ethan never found another father-figure akin to his relationship with Jeremy. *Id.* at ¶ 49. He struggled to cope with his grief in subsequent years, had difficulty trusting others, and was "in and out of trouble in school." *Id.* at ¶¶ 49–50. His grief would manifest in both physical and emotional struggles, and he would "sleep a lot and voice his frustrations with the purpose of his life, always citing Jeremy's death as the reason for his angst." *Id.* at ¶ 52. Ethan was also subjected to media depictions of his father's death. *Id.* at ¶¶ 32–33. While watching the Discovery Channel one day, a segment on the bombing appeared on the screen. *Id.* For the next few moments, Ethan and Dana were forced to "relive[] the tragedy of Jeremy's death yet again." *Id.* at ¶ 32. This trauma has manifested in Ethan's desire to "follow in Jeremy's footsteps his entire life and serve our Nation like his dad did." *Id.* at ¶ 54.

Mary Lee, Jeremy's mother, suffered the unique anguish of a mother's loss. Those close to her testify to how "the grief claimed her health." Ex. 6 at ¶ 35. Before the Attack, Mary Lee was known as "vibrant and full of energy." *Id.* But after Jeremy's death, Mary Heather, his sister, painfully describes how "[m]y dad and I would have to literally peel my mom off the kitchen floor. She frequently became violently ill with migraines, had vomiting episodes, and would then be in bed for days." *Id.* at ¶ 25. Mary Heather further describes the devastating impact of Jeremy's death on their mother, years after his passing:

> In December 2018, we almost lost my mother to a life-threatening stroke. Had she been at home and not with her friends, she would have died. Almost exactly nine years after Jeremy's death, she had a brain hemorrhage in her hypothalamus. She was rushed to the ER and quickly airlifted to the nearest city where she underwent an emergency procedure.

> She has never recovered. . . . Moreover, the stroke scattered much of her memory. Two months after it happened, I held my mother in a hospital room one night after she asked why Jeremy had not come to see her. I had to explain what happened to her oldest son. She wept in my arms as she relived the loss of him all over again, as if once was not enough.

*Id*. at ¶¶ 30–33. After this episode, Mary Lee's physician prescribed her antidepressants, and she began to grieve her son anew. *Id*. at ¶ 34.

Mary Heather had a "very close sibling relationship" with her brother Jeremy. *Id*. at ¶ 4. Jeremy "helped raise" Mary Heather, and they spent several years as roommates during their years of college and medical school. *Id*. at ¶¶ 6–7. They spoke regularly even when he was deployed, and Mary Heather considered Jeremy as one of her "very best friends, confidantes, and inspirations." *Id*. at ¶ 5, 8. As his younger sister, she greatly relied on him for emotional support and considered him "an integral part of [her] daily life." *Id*. at ¶¶ 8–9.

Mary Heather would "frequently wake up to the sound of a bomb going off." *Id*. at ¶ 13. She suffered from chronic insomnia and an accelerated heart rate, with symptoms continuing throughout the day. *Id*. at ¶ 14. Her physician prescribed her an anti-anxiety drug to control her rapid heartbeat and prescription sleeping pills. *Id*. at ¶ 15. For the first year and a half, Mary Heather "became totally nocturnal," causing "bitter distress in her marriage" and affecting her ability to care for her six-year-old autistic daughter. *Id*. at ¶ 16. Mary Heather became too weak physically to even fly to her brother's funeral. *Id*. She was diagnosed with stage four adrenal exhaustion, a life-threatening and potentially fatal condition. *Id*. at ¶ 17. She was eventually diagnosed with PTSD and continues to suffer from not only her own grief, but from watching her parents, daughter, and brothers grieve. *Id*. at ¶¶ 20, 40.

Taking into consideration the Wise family members' close relationships with and deep reliance on Jeremy, the abruptness of his loss, brutality of his death, and repeated media

depictions of the tragedy, Plaintiffs suggest that a fifty percent upward departure should be granted from the *Heiser* framework. Accordingly, Plaintiffs request an award of solatium damages in the amount of $12,000,000 for Dana, $7,500,000 for Ethan, $7,500,000 for Mary Lee, and $3,750,000 for Mary Heather.

### ii.        The Paresi family

The Paresi family plaintiffs include Dane's widow, Mindylou Paresi ("Mindylou"), stepdaughter Alexandra VandenBroek ("Alexandra"), daughter Elizabeth Santina Paresi ("Elizabeth"), mother Janet Paresi ("Janet"), brother Terry Paresi ("Terry"), and sister Santina Cartisser ("Santina"). Like the Wise Family, the sudden loss of a dear loved one, compounded by repeated media coverage of the bombing, inflicted considerable damage to members of the Paresi family.

To MindyLou, Dane was her everything: her "husband, best friend, confidant, hero, protector, and soul mate." *See* Ex. 7 at ¶ 4. She depended on him for all her emotional and financial needs, and their relationship was strong. *See Id*. at ¶ 5. Accordingly, upon learning of Dane's death, MindyLou entered a state of shock, which then gave way to intense grief. *Id*. at ¶¶ 8–9. MindyLou's daughter, Alexandra, paints a vivid picture of her mother's reaction to Dane's death:

> One of the hardest parts for me was watching my mother crumble from the pain of this loss. I remember the worst moment was walking upstairs to find her laying in the closet with his shoes and shirt draped over her, sobbing that her husband and best friend was gone. It was devastating to hear her say, "Why is he gone? He wasn't supposed to leave us."
>
> I watched her have a breakdown as an airline attendant tried to take his uniform from her arms. This was the uniform he would be laid to rest in. She refused and held on so tightly that her hands were white from the blood withdrawing.

*See* Affidavit of Alexandra Vandenbroek, attached as "Exhibit 8" at ¶¶ 13–14. MindyLou has

poured her energy into raising her daughters as a single parent but has struggled to regain her

sense of purpose and normalcy since Dane's death. Ex. 7 at ¶¶ 11–12.

Alexandra had a "very close parent-child relationship" with her stepfather. Ex. 8 at ¶¶ 3–

4. Dane treated Alexandra as his daughter in every way, filling the role of a father. *Id*. at ¶ 5. He

provided not only for her physical and financial needs, but her emotional needs as well. *Id*. at ¶ 9.

He attended her sport events and school programs, spent quality time with her, and answered her

questions about navigating the future. *Id*. at ¶¶ 5–6. Dane and Alexandra communicated at least

weekly even when Dane was overseas. *Id*. at ¶ 8.

Upon learning of Dane's death, Alexandra remembers "hanging up the phone and

screaming into the air, crying . . . and unable to understand how our superhero was taken from

us." *Id*. at ¶ 11. She subsequently left her job for several months to support her mother and

younger sister. *Id*. at ¶ 12. Media coverage of the attack and Dane's death exacerbated

Alexandra's grief:

> I also have unbearable memories of the enormous amount of press
> coverage that happened surrounding the attack. Even worse, much
> of the press coverage was incorrect. It was devastating to see photos
> and news reels on the nightly news of myself as I held my sobbing
> mother.

*Id*. at ¶ 15. Cinematic depictions of the bombing were also unsolicited and nauseating reminders

of the high-profile nature of the tragedy. Like others in the Wise and Paresi families, Alexandra

was unaware that a popular film, *Zero Dark Thirty*, contained a scene depicting the Camp

Chapman Attack. *Id*. at ¶ 20. As the scene progressed, she fled the theater and began to "throw

up from the shock of seeing this on a huge screen." *Id*.

Elizabeth relied on her father "for everything." *See* Affidavit of Elizabeth Santina Paresi, attached as "Exhibit 9" at ¶ 4. She admired him, loved spending time with him, and wanted to emulate his confidence, intelligence, and humor. *Id*. at ¶¶ 5–7. Only nine years old when Dane was killed, Elizabeth initially struggled to comprehend the implications of his death on her life. *Id*. at ¶ 26 ("I felt like I was in a dream"). MindyLou and Elizabeth received news of Dane's death in the middle of the night. *Id*. at ¶ 11. Elizabeth recalls "being shaken awake" by her mother and seeing "two men in dark clothing and a police officer" standing by their front door. *Id*. After a discussion between the adults, Elizabeth remembers her mother turning to her to say, "Daddy's dead." *Id*. at ¶ 12. She recalls the physical symptoms of shock and grief, such as "feeling tired, anxious, and like I had a rock in my stomach all the time." *Id*. at ¶¶ 13, 26.

At the funeral, Elizabeth struggled to grieve and attain closure because she was unable to recognize her father, given that "[h]is body had been damaged so badly in the blast that his entire form was covered in wraps and bandages." *Id*. at ¶¶ 14–15.  As Elizabeth entered her pre-teen and teenage years, she was constantly "plagued with thoughts" of her father's absence, leading to a fruitless search for a father figure, persistent psychological struggles, and disturbing suicidal ideations. *Id*. at ¶¶ 16–18. She became "very secluded and quiet," in stark contrast to her typically "rambunctious and energetic" demeanor. *Id*. at ¶ 23. After Dane's death, Elizabeth's relationships with her friends and father's side of the family deteriorated, leading to further isolation in the midst of her protracted grief. *Id*. at ¶¶ 31–34.

Janet had always had an "emotionally close" relationship with her son. *See* Affidavit of Janet Paresi, attached as "Exhibit 10" at ¶ 4. When Dane was deployed, they spoke as often as circumstances would allow, and he would let Janet use his vehicle while he was overseas. *Id*. at ¶ 7. Although Dane had dreamed of becoming an "army man" from a young age, he always made

sure to communicate with his mother once that dream became a reality. *Id*. at ¶¶ 4–5. One of Janet's greatest heartaches stems from missing Dane's last phone call to her a few days before he was killed. *Id*. at ¶ 6.

Janet describes the grieving process as "drawn out and incredibly difficult." *Id*. at ¶ 11. The days following his death were a whirlwind, as the family was "ushered to Washington, D.C.," and Janet felt that "there was no time to catch [her] breath." *Id*. at ¶ 9. As the years went by, the grief would resurface in challenging ways. *Id*. at ¶ 11. Watching her husband cope with Dane's loss was particularly traumatic for Janet:

> My daughter Santina was at our house, and by that time, my husband had been diagnosed with Dementia. His memories were fading. He looked at her and asked why Dane had not been around in a while. When she told him Dane had died, the look of brokenness on his face was heartbreaking. He had just been told his son died as if for the first time.
>
> We decided from then on that if he asked about Dane, we would tell him Dane was deployed and would call when he could. We couldn't bear to watch him relive the experience of learning about Dane's death.

*Id*. at ¶ 12. While Janet keeps Dane's memory alive in the pictures on her walls, she struggles to accept that she will never "hear [Dane's] voice or see his smile again." *Id*. at ¶¶ 15–16.

To Terry, Dane was not only his brother, but a highly respected mentor. *See* Affidavit of Terry Paresi, attached as "Exhibit 11" at ¶ 4. Terry and Dane "spoke regularly over the years" about the details of their lives, and even more so in the months just prior to Dane's death. *Id*. at ¶¶ 5–6. After Dane was killed, Terry was "wrecked" and struggled to cope with the loss of such a foundational figure in his life. *Id*. at ¶¶ 6–7. As a result, he began to deal with "unique mental battles" in his emotional and mental health. *Id*. at ¶ 8. Terry started seeing a specialist for anxiety and continues to take daily medication to treat anxiety today. *Id*.

Santina had two father figures in her life: her biological father, and her brother, Dane. *See* Affidavit of Santina Cartisser, attached as "Exhibit 12" at ¶ 5. Only a few years apart, Dane and Santina's relationship was always close. *Id*. Dane affectionately called Santina "kid," funded her education, flew to visit her, and opened his home to her as a place of "comfort and refuge" during difficult seasons of her life. *Id*. at ¶¶ 5, 7–9. Santina vividly remembers her distress when Dane left for the army, describing how she "begged him" to delay so that he could attend her eighth-grade graduation. *Id*. at ¶ 6.

As she grew older, this relationship only strengthened. Known as her "big brother and protector," Santina recounts the applause of the staff at a minimart when Dane came to collect her after she had gotten lost one night. *Id*. at ¶ 10. As the "glue" of their family, Dane catalyzed family gatherings, helping keep their family bonds strong. *Id*. at ¶ 11. Just a few weeks before his death, Santina "poured out" her heart to Dane about problems at work, seeking his wisdom. *Id*. at ¶ 12. Upon learning of Dane's death, Santina recalls "sobbing and screaming" into her pillow and the somber drive to inform her parents. *Id*. at ¶¶ 14–15. With Dane's absence, family relationships have suffered because "there is no more Dane to keep us together." *Id*. at ¶ 16.

Plaintiffs suggest that the Paresi family, in consideration of their deep reliance and dependence on Dane, coupled with the abruptness of his loss, brutality of his death, and repeated media coverage of the bombing, should be granted a fifty-percent upward departure from the *Heiser* framework. Plaintiffs not only experienced the traumatic loss of their loved one, but were continuously and publicly reminded of their loss. *See* Ex. 8 at ¶ 20 (Alexandra "began to throw up from the shock of seeing this on a huge screen"); Ex. 9 at ¶¶ 27–29 (Elizabeth recounting how reporters "were constantly at our doorstep," would "bang on the door and call my mother at all hours of the day," and even "look[] through the window to see if we were home"). Accordingly,

Plaintiffs request an award of solatium damages in the amount of $12,000,000 for Mindylou,

$7,500,000 for Alexandra, $7,500,000 for Elizabeth, $7,500,000 for Janet, and $3,750,000 each

for Terry and Santina.

### D.   Punitive Damages

Under the FSIA, a foreign sovereign who is a state sponsor of terrorism may be held

liable for punitive damages. 28 U.S.C. § 1605A(c); *Braun*, 228 F. Supp. 3d at 82. Punitive

damages are awarded not to compensate the victims, but to "punish outrageous behavior and

deter such outrageous conduct in the future." *Id*. at 87. The Court should consider:

> (1) the nature of the act itself, and the extent to which any civilized
> society would find that act repugnant; (2) the circumstances of its
> planning; (3) Defendants' economic status with regard to the ability
> of Defendants to pay; and (4) the basis upon which a Court might
> determine the amount of an award reasonably sufficient to deter like
> conduct in the future, both by the Defendants and others.

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 33 (D.D.C. 1998). However, "application of

these factors has not led to a single approach for calculating the amount of punitive damages."

*Christie v. Islamic Republic of Iran*, No. CV 19-1289 (BAH), 2020 WL 3606273, at *21 (D.D.C.

July 2, 2020); *Selig*, 2021 WL 5446870, at *23.

The first approach "multiplies a defendant's financial support for international terrorism .

. . by a pre-determined multiplier" of usually either three or five. *Beer v. Islamic Republic of

Iran*, 789 F. Supp. 2d 14, 17 (D.D.C. 2011). This is the process known as "the Flatow Method."

As the annual expenditures by state sponsors of terrorism continue to rise, courts have

recognized that this method leads to exceedingly high awards of punitive damages. As a result,

some decisions from this Court have held that the Flatow Method should be reserved for

"exceptionally deadly attacks," such as the 1983 Beirut bombing that resulted in the deaths of

241 American servicemembers. *See Braun*, 228 F. Supp. 3d at 87.

In light of this, a second approach developed that "awards a fixed amount of $150,000,000 per affected family." *Id.* (citing *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008)). This approach is typically applied when the terrorist attacks are deadly or where "similar conduct has never been litigated." *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 117 (D.D.C. 2020); *see W.A. v. Islamic Republic of Iran,* No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *20 (D.D.C. Mar. 23, 2020), *report and recommendation adopted*, No. CV 18-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020) ("the weight of the case law indicates that in cases where at least one of the plaintiffs dies, the lump sum approach is used").

A third approach multiplies the total compensatory damages awarded a victim "by a factor between one and five." *Fritz*, 324 F. Supp. 3d at 65 (granting multiplier of two times compensatory damages) (cleaned up). This multiplier is determined based on the severity and reprehensibility of the attack, *Selig*, 2021 WL 5446870, at *23, and whether the case "involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities." *Frost*, 419 F. Supp. 3d at 117.

Here, the relevant factors support an award of punitive damages. The Camp Chapman Attack was a unique example of reprehensible and deceptive conduct, calculated to inflict maximum damage on the United States Intelligence Services, its contractors, and allies. With its vast provision of material support, Iran equipped al Qaeda. *See*, *e.g*., *Blank,* 2021 WL 3021450, at *10 (punitive damages awarded where Iranian-backed terrorist group conducted violent attack injuring and killing U.S. servicemembers).

Although devastating to Plaintiffs, the facts of this case do not rise to the "exceptionally deadly" level of incidents such as the 1983 Beirut bombing or the September 11, 2001 attacks to merit a multiplier of Iranian expenditures on terrorism. Arguably, either the second and third approach would be appropriate here given the deadly, complex, premeditated, and reprehensible nature of the Attack. Plaintiffs suggest that awarding punitive damages of $150,000,000 per affected family is the most suitable measure of punitive damages given the facts of this case. *See W.A.*, No. 18-CV-1883(CKK/GMH), 2020 WL 7869218, at *20.

## VIII.    CONCLUSION[27]

By knowingly and purposefully providing material support to al Qaeda and its allies, Iran facilitated the deadly attack on Camp Chapman and did so intending to bring about violent acts against American citizens like Jeremy and Dane. Accordingly, the case before this Court is squarely in line with the policy and purpose behind the FSIA's terrorism exception. *See* 28 U.S.C. § 1605A. Today, Plaintiffs come seeking their only available measure of justice through a finding of liability against Iran and an award of damages for the harm caused through the extrajudicial killings of Jeremy Wise and Dane Paresi.

WHEREFORE, Plaintiffs pray that this Court grant final judgment against Iran on Counts I and II and award the following:

For Count I, a total sum of $184,427,674, allocated accordingly:

- Economic damages in the amount of $3,677,674 to the Estate of Jeremy Wise;

- Solatium damages for the Wise family in a total amount of $30,750,000, comprised of the following sums:

---

[27] In light of the Court's disinclination to grant prejudgment interest for solatium claims, where the compensation awarded is for injuries that are ongoing, *see Pennington v. Islamic Republic of Iran*, No. CV 19-796 (JEB), 2022 WL 168261, at *5 (D.D.C. Jan. 19, 2022), Plaintiffs withdraw their requests for prejudgment. ECF No. 1 at 24-25.

- $12,000,000 to Dana Marie Bernhardt, wife of Jeremy Wise;
- $7,500,000 to Ethan Prusinski, stepson of Jeremy Wise;
- $7,500,000 to Mary Lee Wise, mother of Jeremy Wise;
- $3,750,000 to Mary Heather Wise, sister of Jeremy Wise;

- Punitive damages in the amount of $150,000,000, divided proportionately between the Wise family plaintiffs in line with their respective awards of compensatory damages.

For Count II, a total sum of $194,835,747, allocated accordingly:

- Economic damages in the amount of $2,835,747 to the Estate of Dane Paresi;

- Solatium damages for the Paresi family in a total amount of $42,000,000, comprised of the following sums:

  - $12,000,000 to Mindylou Paresi, widow of Dane Paresi;
  - $7,500,000 to Alexandra Vandenbroek, stepdaughter of Dane Paresi;
  - $7,500,000 to Elizabeth Santina Paresi, daughter of Dane Paresi;
  - $7,500,000 to Janet Paresi, mother of Dane Paresi;
  - $3,750,000 to Terry Paresi, brother of Dane Paresi; and
  - $3,750,000 to Santina Cartisser, sister of Dane Paresi.

- Punitive damages in the amount of $150,000,000, divided proportionately between the Paresi family plaintiffs in line with their respective awards of compensatory damages.

Based on the totality of the evidence submitted, Plaintiffs request that the Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and damages.

Dated: April 18, 2022

Respectfully submitted,

_____/s/ Kevin A. Hoffman_____
Randy D. Singer (DCD Bar No. VA057)
Rosalyn K. Singer (DCD Bar No. VA063)
Kevin A. Hoffman (DC Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: rosalyn.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*

## <u>REFERENCE TABLE FOR EXHIBITS</u>

Exhibit 1: Dr. Daveed Gartenstein-Ross Expert Report

Exhibit 2: House Congressional Record, January 20, 2010, H223, Vol. 156, No 6

Exhibit 3: Jeremy Wise Economics Report

Exhibit 4: Dane Paresi Economics Report

Exhibit 5: Dana Bernhardt Affidavit

Exhibit 6: Mary Heather Wise Affidavit

Exhibit 7: MindyLou Paresi Affidavit

Exhibit 8: Alexandra VandenBroek Affidavit

Exhibit 9: Elizabeth Santina Affidavit

Exhibit 10: Janet Paresi Affidavit

Exhibit 11: Terry Paresi Affidavit

Exhibit 12: Santina Cartisser Affidavit