**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DANA MARIE BERNHARDT et al.,

*Plaintiffs*,

v.

ISLAMIC REPUBLIC OF IRAN,

*Defendant*.

Civil Action No. 18-2739 (TJK)

## <u>MEMORANDUM OPINION</u>

Almost 15 years ago, a Jordanian doctor with ties to al-Qaeda detonated his suicide vest at Camp Chapman, a covert American military installation in Afghanistan.  The deadliest attack on the Central Intelligence Agency in recent history took the lives of nine persons at the base, including American contractors Jeremy Wise and Dane Paresi.  Plaintiffs—the two contractors' estates and family members—allege that the Islamic Republic of Iran provided al-Qaeda with material support for the attack.  Thus, they allege, Iran should be held liable for it under the Foreign Sovereign Immunities Act.  For the reasons explained below, the Court agrees, and will grant their pending Motion for Default Judgment, enter judgment against Iran, and award damages of $268,553,684.

**I.      Background**

**A.      Factual Background**

On December 30, 2009, Humam Khalil al-Balawi, a Jordanian doctor affiliated with al-Qaeda, detonated a vest containing over thirty pounds of C-4 explosives and shrapnel shortly after

arriving at Forward Operating Base Chapman ("Camp Chapman").[1]  ECF No. 48 at 1; ECF No. 48-1 at 39, 41; ECF No. 48-2 at 1–2.[2]  Camp Chapman was a clandestine Central Intelligence Agency ("CIA") installation in Khost, Afghanistan.  ECF No. 48 at 1; ECF No. 48-1 at 40.  The American intelligence community had believed al-Balawi was a double agent embedded within al-Qaeda's top leadership in northwest Pakistan who could help the United States and Jordan infiltrate al-Qaeda.  ECF No. 48-1 at 39–40.  Al-Balawi had represented to CIA operatives that he had access al-Qaeda's second-in-command, Ayman al-Zawahiri.  *Id.* at 40.  On that understanding, CIA officials arranged for a meeting with al-Balawi at Camp Chapman.  *Id.* at 39–41.

But tragically, al-Balawi was a triple agent who had conspired with al-Qaeda to plan a suicide attack.  ECF No. 48-1 at 40–41.  After he arrived at Camp Chapman, Wise and Paresi approached him and noticed one of his hands was concealed.  *Id.* at 41.  They ordered him to show his hands, but al-Balawi detonated his vest.  *Id.*; *see also* ECF No. 48 at 10, 12 (citing Joby Warrick, *The Triple Agent: The Al-Qaeda Mole Who Infiltrated the CIA* 8 (2012)).  Along with al-Balawi's own life, the explosion took nine others, including Paresi and Wise, and wounded several more. ECF No. 48-1 at 41.  The attack was the "single deadliest episode" for the CIA since September 11, 2001.  ECF No. 48 at 2 (quoting Alissa J. Rubin & Mark Mazzetti, *Suicide Bomber Killed*

---

[1] Founded in the late-1980s during the final days of the Afghan-Soviet War, al-Qaeda rapidly gained international notoriety as a broad-based militant Islamic organization involved in the planning and execution of terrorist acts worldwide, including the bombing of two American embassies in East Africa and the September 11, 2001 attacks in the United States.  ECF No. 48-1 at 16–18, 20–25.

[2] In resolving this Motion, the Court relies on the uncontroverted factual assertions in Plaintiffs' Amended Complaint, ECF No. 10, Plaintiffs' Memorandum in Support of their Motion for Default Judgment, ECF No. 48, evidence attached to that Memorandum, ECF Nos. 48-1 to -12, and other facts of which the Court takes judicial notice.

*C.I.A. Operatives*, N.Y. Times (Dec. 30, 2009), https://www.nytimes.com/2009/12/31/world/asia/31khost.html).

According to Plaintiffs, the suicide bombing at Camp Chapman was a part of a broader conspiracy between al-Qaeda, Tehrik-e-Taliban Pakistan ("TTP"), and Iran to attack the United States and its allies.[3] *See* ECF No. 48 at 1–2, 17–21.  Iran has supported al-Qaeda since the early 1990s.  ECF No. 48-1 at 21–31.  According to the Treasury Department, Iran has historically "serve[d] as the core pipeline through which [al Qaeda] move[d] money, facilitators, and operatives from across the Middle East to South Asia."  ECF No. 48 at 2 & n.4 (alterations in original) (quoting U.S. Dep't of Treasury, *Treasury Targets Key al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://home.treasury.gov/news/press-releases/tg1261); ECF No. 48-1 at 27–29, 50.  In addition, the Treasury Department has described Iran as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan."  ECF No. 48 at 16 & n.22 (citation omitted); *see also* ECF No. 48-1 at 50 & n.221.  Iran's support extended to the TTP, too.  According to the State Department, the TTP has a "symbiotic relationship" with al-Qaeda, providing al-Qaeda "safe haven" in exchange for "ideological guidance."  ECF No. 48-1 at 17, 33.  Iran indirectly supported the TTP by providing sanctuary and cross-border mobility to Atiyah Abd al-Rahman—an al-Qaeda leader with close ties to Osama bin-Laden—who "played a central role in [al-Qaeda and the TTP's] alliance."  *Id.* at 28, 35, 48–49.

These channels of support, according to Plaintiffs' expert, were crucial ingredients of the Camp Chapman attack, because the success of the mission relied on extensive financial, material,

---

[3] The TTP, also known as the Movement of the Taliban in Pakistan, is a Pakistan-based militant group founded in 2007.  ECF No. 48-1 at 31.

and logistical assistance from Iran.  ECF No. 48-1 at 21–31, 47–50; ECF No. 48 at 2.  Specifically, according to Plaintiffs' expert, before the Camp Chapman bombing, Iran provided al-Qaeda with the ability to move funds internationally; the opportunity to travel without hindrance across its borders into Afghanistan and Pakistan; and the funding necessary to establish and maintain the communications and training networks that facilitated the planning and execution of the attack.  *See* ECF No. 48-1 at 21, 24, 27–29, 47–50; ECF No. 48 at 2, 16–17.  The sanctuary and mobility Iran gave al-Rahman proved particularly important.  Al-Rahman helped forge the alliance between al-Qaeda and the TTP.  ECF No. 48-1 at 35–37, 49–50.  Al-Balawi's "first point of contact with Islamist militant groups was with the TTP."  *Id.* at 50.  And as described in more detail below, al-Rahman himself helped "engineer[]" the attack.  *Id.* at 48–49.  Thus, Plaintiffs' expert concluded that Iran's aid to al-Qaeda and others bore a "definite connection to the attack on Camp Chapman."  *See id.* at 51.

Because Wise and Paresi were killed in the attack, they could not fulfill their professional aspirations after leaving their positions as CIA contractors.  ECF No. 48-1 at 41; ECF No. 48-2 at 1–2.  Upon completion of his 90-day security contract with the CIA, Wise had intended to return to the United States to continue medical school, which he had put on pause so that he could enlist in the Navy following September 11.  *See* ECF No. 48 at 29; *see also* ECF No. 48-3 at 2.  Likewise, Paresi had planned to pursue employment at home after concluding his final stint as a CIA contractor.  *See* ECF No. 48 at 29–30; *see also* ECF No. 48-4 at 2.

Wise's and Paresi's families have and will continue to suffer profoundly as a result of their deaths.  Wise's sudden passing has taken an immense physical, mental, and emotional toll on his close family members.  His widow, Dana Bernhardt, and his stepson, Ethan Prusinski, have been left without the emotional and financial support for which they once depended on Wise.  ECF

No. 48-5 ¶¶ 9–10.  Bernhardt recounts losing her "best friend" and the "one constant" in her life. *Id.* ¶ 4.  She has sought counseling and treatment for depression, elevated stress, and anxiety.  *Id.* ¶¶ 26–27.  And she continues to grieve his loss and suffers from panic attacks, regular night terrors, and symptoms consistent with post-traumatic stress disorder ("PTSD").  *Id.* ¶¶ 27–28.  Prusinski had an "inseparable" father-son bond with Wise.  *Id.* ¶ 41.  After the loss of his only father figure at age six, he struggled to cope with his grief, struggled to trust others, and was "in and out of trouble in school."  *Id.* ¶¶ 49–50.  As a result, he attended counseling throughout his childhood. *Id.* ¶ 49.  Later as a young adult, he harbored "frustrations with the purpose of his life," which he attributes to Wise's death.  *Id.* ¶ 52.

Wise's parents and siblings have suffered, too.  Wise's father's health "rapidly declined" following the attack, leading to such frequent crying that he had broken blood vessels under his eyes. ECF No. 48-6 ¶¶ 23–24.  He passed away from Parkinson's disease in 2016. *Id.* ¶ 27.  Wise's mother Mary Lee Wise also experienced a sharp decline in health after her son's death.  *Id.* ¶ 35. She became violently ill with migraines, had vomiting episodes, refused to leave her bed for days, and many years later suffered a life-threatening stroke and hemorrhage that rendered her bedridden, mentally scattered, and partially immobilized.  *Id.* ¶¶ 25–32.  Those close to Wise's mother "know the grief claimed" her health.  *Id.* ¶ 35.  Finally, Wise's sister Mary Heather Wise suffered from chronic insomnia and an accelerated heart rate because of her brother's death.  *Id.* ¶¶ 14–16.  As the months went on, her grief strained her marriage, and she struggled to care for her young daughter who is on the autism spectrum.  *Id.* ¶ 16.  At one point, Mary Heather Wise became so physically weak that she went into stage-four adrenal exhaustion.  *Id.* ¶¶ 14–19.  Later, she was diagnosed with PTSD.  *Id.* ¶ 20.  Her own grief was exacerbated by having to watch and

support her parents as they mourned the loss of their son. *Id.* ¶¶ 22, 24, 28, 33. She now relies on anti-anxiety and sleeping medication. *Id.* ¶ 15.

Paresi's family members have also experienced severe physical and emotional pain in the wake of the attack. Paresi's widow, Mindylou Paresi, suffers from intense bouts of grief having lost her "husband, best friend, confidant, hero, protector, and soul mate," and she has attended therapy to learn how to better cope with his passing. ECF No. 48-7 ¶¶ 4, 14. Since her husband's death, she has struggled to regain her sense of normalcy and goes through life "feeling empty," "without direction," and "in freefall." *Id.* ¶¶ 10–12. Paresi's death also brought "trauma" to his stepdaughter, Alexandra VandenBroek, and daughter, Elizabeth Santina Paresi, who have been plagued by mental distress over the past decade. ECF No. 48-8 ¶¶ 13–14, 24; ECF No. 48-9 ¶¶ 11–23. VandenBroek, for her part, suffered an indescribable emotional toll processing the loss of her "heart and cornerstone of [her] family" and "superhero." ECF No. 48-8 ¶¶ 10–11. She had to leave her job to help support her incomplete family unit, and, perhaps most painful, she had to watch her mother "crumble from the pain of this loss." *Id.* ¶ 13. The great deal of press coverage of her father's death—much of it, she says, incorrect—compounded her and her family's grieving process. *Id.* ¶ 15; *see also id.* ¶ 20 (describing her harrowing experience inadvertently watching the movie *Zero Dark Thirty*, which depicts the Camp Chapman bombing). For Elizabeth Santina Paresi, the mental distress has manifested itself in persistent psychological struggles and suicidal ideations. ECF No. 48-9 ¶¶ 16–18. She yearned for a father "more than anything" but "knew that wish would never come true." *Id.* ¶ 16. Once "adventurous," and "confident," she says she is now "very secluded and quiet" and is "unsure of a lot of things, hesitant, and anxious to perform and complete tasks." *Id.* ¶ 23. As with her stepsister, the onslaught of press compounded her grief. *Id.* ¶¶ 27–28.

Paresi's parents suffered the pain of losing their firstborn son.  Janet Paresi, Paresi's mother, underwent a "drawn out and incredibly difficult" grieving process, ECF 48-10 ¶ 11, and has been retraumatized watching her husband with dementia struggle to cope with recurring realizations of his son's death, *id.* ¶¶ 12–13.  Paresi's brother Terry Paresi was "wrecked" upon learning of his lifelong mentor's sudden passing.  ECF No. 48-11 ¶¶ 4, 6.  He now sees a specialist and takes medication daily to treat his anxiety.  *Id.* ¶¶ 7–8.  Lastly, Paresi's sister Santina Cartisser comments how "difficult [it is] to convey the absolute shock that went through [her] brain" when she learned her brother had been killed.  ECF No. 48-12 ¶ 14.  She notes that relationships within their family have deteriorated because her brother was the "glue to [their] dysfunctional family." *Id.* ¶¶ 11, 16.

### B.    Procedural Background

In 2018, Plaintiffs filed suit against Iran.  ECF No. 1.  They sought relief under the Foreign Sovereign Immunities Act ("FSIA") for Wise's and Paresi's extrajudicial killings in connection with the Camp Chapman attack and the families' resulting injuries.  *See id.*  Plaintiffs later filed an Amended Complaint that added four HSBC-affiliated financial institutions as Defendants along with Iran.  *See* ECF No. 10.  The Court dismissed the claims against the HSBC Defendants for lack of personal jurisdiction, as well as for Plaintiffs' failure to state a claim under the Justice Against Sponsors of Terrorism Act, and the Circuit affirmed.  *See Bernhardt v. Islamic Republic of Iran,* No. 18-cv-2739 (TJK), 2020 WL 6743066 (D.D.C. Nov. 16, 2020), *aff'd*, 47 F.4th 856 (D.C. Cir. 2022).  Thus, Iran remains as the sole Defendant.

After Plaintiffs amended their complaint, the Court reissued summons as to Iran, ECF No. 13, and Plaintiffs initiated service via registered mail under 28 U.S.C. § 1608(a)(3).  ECF No. 21.  Plaintiffs then waited thirty days under 28 U.S.C. § 1608(a)(4), before requesting that the

State Department help serve Iran by diplomatic means.  ECF No. 29.  In July 2020, Iran was served with, and refused to accept, a copy of the summons, Amended Complaint, and notice of suit through the embassy of Switzerland in Tehran, Iran.  *See* ECF No. 36.  Iran never responded to the Amended Complaint or otherwise appeared.  Thus, the clerk entered default against Iran, ECF No. 46, and Plaintiffs promptly moved for default judgment.[4]  ECF No. 48.

## II.     Legal Standard

Under Federal Rule of Civil Procedure 55, a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and so "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  The "determination of whether a default judgment is appropriate is committed to the discretion of the trial court."  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson*, 636 F.2d at 836).

Even if a party fails to respond or refuses to participate in the litigation, "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  Rather, a court retains its "affirmative obligation" to determine whether it has subject-matter

---

[4] In their proposed order and memorandum in support of their Motion, Plaintiffs separated their claims for the Wise family into "Count I" and for the Paresi family into "Count II."  ECF No. 47-1; ECF No. 48 at 43–44.  But as already mentioned, the Court dismissed from the Amended Complaint the counts brought against the HSBC Defendants, Counts II and III.  *See* ECF No. 10 ¶¶ 254–80.  Only Count I of the Amended Complaint is brought against Iran.  *See id.* ¶¶ 244–53.  Thus, despite Plaintiffs' requesting judgment against Iran on "Count I" *and* "*Count II*," the Court construes Plaintiffs' Motion as requesting judgment only on Count I.

jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. "The party seeking default judgment has the burden of establishing both subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). With no evidentiary hearing, the burden to show personal jurisdiction can be satisfied "with a *prima facie* showing." *Mwani*, 417 F.3d at 7. And in providing such a showing, "[the party] may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."). And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)). To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with

the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). But "uncontroverted factual allegations" supported by admissible evidence may be taken as true. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). A court may also "take judicial notice of any fact 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting Fed. R. Evid. 201(b)); *see also Detroit Int'l Bridge Co. v. Gov't of Can.*, 133 F. Supp. 3d 70, 85 (D.D.C. 2015) ("[J]udicial notice may be taken of public records and government documents available from reliable sources."). And 28 U.S.C. § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Ultimately, "the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim*, 774 3d. at 1047.

In an FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding." *Owens*, 864 F.3d at 785 (citation omitted). "This lenient standard is particularly appropriate for [an] FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* Thus, courts are given "an unusual degree of discretion over evidentiary rulings in [an] FSIA case against a defaulting state sponsor of terrorism." *Id.* And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of

terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted). Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id.* For these reasons, the Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

## III.    Analysis

A court may enter a default judgment in an FSIA case "when (1) the Court has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages that they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *accord Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 32 (D.D.C. 2018). The Court addresses each in turn.

### A.    Subject-Matter Jurisdiction

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price*, 294 F.3d at 87 (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Under the FSIA, a federal court has original jurisdiction over "(1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605 to 1607 of [this title] or under any applicable international agreement." *Shoham v. Islamic Republic of Iran*, No. 12-cv-508

(RCL), 2017 WL 2399454, at *10 (D.D.C. June 1, 2017); 28 U.S.C. § 1330(a).  The first three prerequisites are easily met here.

First, even though Plaintiffs' Amended Complaint (which included the HSBC Defendants) demanded a jury trial, ECF No. 10 at 1, 61, the FSIA does not permit such a proceeding against a foreign state, *see Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 123 (D.D.C. 2019) (All "federal appellate courts which have considered the issue . . . have held that jury trials are not available in suits brought under the [FSIA]." (citation omitted) (alterations in original)).  Now that the Court has dismissed the HSBC Defendants, *Bernhardt*, 2020 WL 6743066, at *8, this action is a "nonjury civil action," as Plaintiffs acknowledge, s*ee* ECF No. 48 at 10.  *See also* Fed. R. Civ. P. 39(a)(2) (permitting a court to dispense with jury-trial demand when it finds, "on motion or on its own, . . . that on some or all of those issues [for which a jury trial is demanded] there is no federal right to a jury trial").  Second, this is an action seeking relief *in personam* not *in rem*.  *See Shoham*, 2017 WL 2399454, at *10 (explaining that suing defendants as "legal persons" rather than "property" means that the claims "seek relief *in personam*"); *Thuneibat*, 167 F. Supp. 3d at 34 (holding that a lawsuit seeking damages from Syria to compensate for a suicide bombing sought *in personam* relief).  Third, Iran "is plainly a foreign state."  *Shoham*, 2017 WL 2399454, at *10.  Thus, the only outstanding subject-matter-jurisdiction question is whether the FSIA or another international agreement entitles Iran to immunity.

"A foreign state is typically immune from jurisdiction in [United States] courts," but the FSIA provides a narrow set of exceptions to that immunity.  *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 152 (D.D.C. 2019) (citing 28 U.S.C. § 1604); *see also Amerada Hess*, 488 U.S. at 439 ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal

court[.]").  Plaintiffs here invoke the FSIA terrorism exception, which provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused" by an enumerated act of terrorism.  28 U.S.C. § 1605A(a)(1); *see also* 28 U.S.C. § 1330.  Plaintiffs must prove three elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated as a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act; and (3) the damages sought are for personal injury or death caused by the act of terrorism.[5]  *See Akins*, 332 F. Supp. 3d at 32; 28 U.S.C. § 1605A.  Plaintiffs have met their burden at this stage on each of these elements.

### 1.    Iran Was Timely Designated a State Sponsor of Terrorism

The State Department designated Iran a state sponsor of terrorism in 1984, and the country has remained so designated since.  *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 100 (D.D.C. 2019) (first citing Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984); and then citing U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 21, 2023)).  The State Department even declared that "Iran remained the most active state sponsor of terrorism" in 2009, the same year as the Camp Chapman attack.  U.S. Dep't of State, *Country Reports on Terrorism 2008: Chapter 3: State Sponsors of Terrorism* (Apr. 30, 2009), https://2009-2017.state.gov/j/ct/rls/crt/2008/122436.htm.

---

[5] The statute also requires a plaintiff to offer to arbitrate a claim against a foreign state in that foreign state when the acts causing injury occurred there.  But here, the acts occurred in Afghanistan, not Iran.  Thus, Plaintiffs need not have offered arbitration to establish subject-matter jurisdiction.  *See* 28 U.S.C. § 1605A(a)(2)(A)(iii); ECF No. 10 ¶ 22; *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104 (TJK), 2022 WL 971328, at *4 n.1 (D.D.C. Mar. 31, 2022).

### 2.  Plaintiffs Are U.S. Nationals

Wise, Paresi, and Plaintiffs were all United States citizens at the time of the Camp Chapman attack.  *See* ECF No. 48 at 11; ECF No. 48-2 at 4–5; ECF No. 48-5 ¶¶ 2–3; ECF No. 48-6 ¶ 2; ECF No. 48-7 ¶¶ 2–3; ECF No. 48-8 ¶ 2; ECF No. 48-9 ¶ 2; ECF No. 48-10 ¶ 2; ECF No. 48-11 ¶ 2; ECF No. 48-12 ¶ 2; *see also* 28 U.S.C. § 1605A(c)(4) (A "legal representative," like an estate, can bring suit on behalf of a United States national under the FSIA terrorism exception.).  And United States citizens are nationals for FSIA purposes.  28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3.  Iran's Actions Qualify for the Terrorism Exception

The final element of the subject-matter jurisdiction inquiry requires that Plaintiffs seek damages for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  As described below, Plaintiffs have met their burden by showing that: (1) Wise and Paresi were the victims of the extrajudicial killing at Camp Chapman and (2) Iran's provision of financial, material, and logistical support to al-Qaeda was a legally sufficient cause of the attack. *See* ECF No. 10 at 10–21.

### a.  The Camp Chapman Attack Was an Extrajudicial Killing

An "extrajudicial killing" for purposes of the FSIA is defined via the Torture Victim Protection Act of 1991 as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Torture Victim

Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note § 3A); 28 U.S.C. § 1605A(h)(7).  The D.C. Circuit has interpreted this text to include three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a constituted court."  *Hamen*, 401 F. Supp. 3d at 101 (citing *Owens*, 864 F.3d at 770).

The attack at Camp Chapman satisfies all three elements for an "extrajudicial killing" under the FSIA.  First, al-Balawi detonated a suicide vest at Camp Chapman, killing Wise, Paresi, and seven others.  ECF No. 48-2 at 4.  Second, the attack was deliberated; that is, it was "undertaken with careful consideration, not on a sudden impulse."  *Hamen*, 401 F. Supp. 3d at 101.  Working with top al-Qaeda operatives, al-Balawi portrayed himself as a double agent for the United States embedded within the organization, although he was really a triple agent.  ECF No. 48-1 at 40, 42.  With al-Qaeda's assistance, he produced credible evidence that "signal[led] to Western intelligence that he had succeeded in penetrating the group."  *Id.* at 40.  He then parlayed the CIA's trust in him into a meeting at Camp Chapman, where he planned to (and did) detonate his suicide vest.  *Id.* at 41.  Al-Balawi even recorded videos that al-Qaeda and others would distribute upon the anticipated attack.  *Id.* at 42.  Third, there is no evidence that the suicide bombing was authorized by a judgment of a "regularly constituted court or [was] lawfully carried out under the authority of a foreign nation."  *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 492 (D.D.C. 2021).  Thus, the Camp Chapman attack constitutes an extrajudicial killing under the FSIA.[6]

---

[6] Courts regularly find that suicide bombings, like the one at issue, are extrajudicial killings.  *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 34 (D.D.C. 2012) (suicide attack at an Israeli restaurant); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 149–50 (D.D.C. 2011) (suicide bombings at two U.S. embassies); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 80 (D.D.C. 2006) (suicide bombing of an Israeli passenger bus).

### b.       Iran's Material Support Caused the Camp Chapman Attack

Next, to "establish the court's jurisdiction, the plaintiffs in this case must show (1) [Iran] provided material support to al-Qaeda and (2) its material support was a legally sufficient cause of the [Camp Chapman attack]."  *Owens*, 864 F.3d at 778; *see, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 135–36 (D.D.C. 2019).

### i.       Plaintiffs Have Presented Evidence Sufficient to Show that Iran Provided Material Support to al-Qaeda and Related Organizations

Under the relevant statute, material support or resources is "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."   18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" under the FSIA to have the "meaning given that term in section 2339A of title 18").

To start, Plaintiffs have presented sufficient evidence that al-Qaeda and its allies were responsible for the attack at Camp Chapman.  They have established a clear link between al-Balawi—the person who actually carried out the suicide bombing—and various organizations, including al-Qaeda and the TTP.  In early 2009, the Jordanian General Intelligence Directorate ("GID") arrested, held captive, and interrogated al-Balawi for jihadist sympathies he shared online. ECF No. 48 at 9; ECF No. 48-1 at 39.  Afterward, the GID continued to monitor al-Balawi and ended up recruiting him to help the GID and the CIA with their search for terrorists, including al-Qaeda's first-in-command, bin Laden, and second-in-command, al-Zawahiri.  ECF No. 48-1 at 39–40.  At the GID's directive, al-Balawi began to cultivate a relationship with the TTP and prominent al-Qaeda leaders, such as al-Zawahiri.  *Id.* at 40.  By the summer of 2009, al-Balawi

16

had moved to Pakistan to live and meet with top TTP and al-Qaeda officials on TTP members' invitation.  *Id.*  By ingratiating himself within these groups, al-Balawi successfully convinced Jordanian and United States intelligence officials that he was an asset with access to critical information about al-Qaeda.  *Id.* at 40–41.

Despite appearances to the CIA and the GID, however, al-Balawi's "allegiance to al-Qaeda and the TTP never wavered."  ECF No. 48-1 at 39.  While in Pakistan, according to statements issued by al-Qaeda and the TTP after the attack, al-Balawi participated in the careful planning of the suicide bombing, engaged in extensive training with al-Qaeda and TTP militants, and recorded videos about the anticipated attack designed for distribution on several jihadist media networks.  *Id.* at 40–41, 44.  Indeed, al-Qaeda also gave al-Balawi the evidence—a staged video of al-Balawi next to senior al-Qaeda leaders, including al-Rahman—that he provided to the GID and that ultimately enabled him to earn the GID's and the CIA's trust.  *Id.* at 40.

The week after the Camp Chapman attack, both al-Qaeda and the TTP claimed responsibility on jihadist web forums via their media affiliates.  ECF No. 48-1 at 42–45.  Information corroborating these claims emerged through open-source reporting, credible statements by the organizations' media representatives, and the release of other pieces of propaganda after the attack, such as the videos taken of al-Balawi with the groups' leaders just days before the suicide bombing.  *Id.*  Ultimately, the State and Justice Departments concluded that the TTP participated in the planning of the attack.  *Id.* at 44 & nn.196–98.  And based on a review of all this information, Plaintiffs' expert Dr. Daveed Gartenstein-Ross concludes that, in

his "expert opinion," "[a]l-Qaeda and the TTP [were] directly responsible for the attack."[7]  ECF No. 48-1 at 3.

Plaintiffs have also provided sufficient evidence that Iran provided financial, material, and logistical support to al-Qaeda and its allies—including support used by al-Qaeda in its planning and execution of the Camp Chapman attack.  Plaintiffs rely on Gartenstein-Ross's report detailing several causal connections between Iranian support for these militant groups and the attack at Camp Chapman.  *See* ECF No. 48 at 18–20; ECF No. 48-1 at 47–50.  He concludes that Iran's material support of violent non-state actors was a cause of the Camp Chapman attack.  *See id.* at 51.

First, Gartenstein-Ross describes Iran's earlier support of al-Qaeda following the attacks on September 11, 2001.  He notes that Iran provided safe passage and sanctuary to militants fleeing Afghanistan, including many high-ranking al-Qaeda operatives, after the United States overthrew the Taliban government in Afghanistan.  ECF No. 48-1 at 47.  The promise of safe passage and sanctuary gave al-Qaeda "the time and space it required to recover, regroup, and rebuild its organization."  *Id.*  Under Iran's tutelage, al-Qaeda leaders formed an Iran-based management

---

[7] Gartenstein-Ross's report is based on his extensive knowledge, experience, training, and education concerning violent non-state actors, *see* ECF No. 48-1 at 4–15, and his comprehensive review of the relevant primary and secondary sources on the matter, *id.* at 15–16.  Consistent with the well-established practice of courts in this Circuit, and "[c]onsidering the requirements of Federal Rule of Evidence 702, the Court [finds] Dr. Gartenstein-Ross qualified to offer the opinions relied upon herein as an expert on Iranian support for violent non-state actors . . . ."  *See Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS/ZMF), 2022 WL 17370239, at *3 n.2 (D.D.C. Sept. 8, 2022) (collecting cases), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 63 (D.D.C. 2018) ("credit[ing] Dr. Gartenstein-Ross's expert opinion that Iran provided significant material support" (citation omitted)); *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 (D.D.C. 2017) ("qualif[ying] Daveed Gartenstein-Ross as an expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism").

council to provide strategic assistance to the group's central leadership in Pakistan. *Id.* This council also executed several attacks across the region during the leaders' prolonged stay in the country. *Id.* As recent as 2021, the State Department identified several senior al-Qaeda officials continuing to use Iran as a refuge. *Id.* at 29–31.

Second, Iran provided al-Rahman, who played a key role in the attack, with considerable support and freedom that paved the way for the attack. ECF No. 48-1 at 48–49. Specifically, Iran provided al-Rahman with both protection and the ability to move across its borders freely. As to the former, in the wake of September 11, Iran gave al-Rahman sanctuary in the country, where he climbed al-Qaeda's ranks and eventually assumed a position of significant authority. *Id.* at 48. After five years under Iranian protection, al-Rahman became recognized as "one of al-Qaeda's top strategic thinkers and spiritual advisors." *Id.* (quoting Warrick, *supra*, at 115–16). And Iran allowed al-Rahman to travel back and forth between Pakistan—where the planning for the Camp Chapman attack took place—and Iran. ECF No. 48-1 at 48–49. Indeed, the Treasury Department later reported that bin Laden had appointed al-Rahman to be "al-Qaeda's emissary to Iran." *Id.* at 49. In this role, he could travel liberally to and from Iran "with the permission of Iran officials," a "very rare" privilege for al-Qaeda's Iran-based leadership. *Id.*

In the end, al-Qaeda leveraged al-Rahman's high-ranking status and freedom of movement, made possible by Iran, to pull off the Camp Chapman attack. Al-Qaeda had al-Rahman appear in the staged video with al-Balawi that al-Balawi sent to the GID to signal that he had successfully penetrated the group. ECF No. 48-1 at 40, 49. The video served as the "bait to lure" CIA operatives into arranging a meeting with al-Balawi, as al-Rahman was "one of the closest associates of al-Qaeda leader Osama bin Laden known to be alive." *Id.* at 39, 48 (quoting Warrick, *supra*, at 115–16). The ploy worked: when CIA and GID officials saw the video, al-Rahman's

face—unseen by American intelligence officers for over eight years—was "instantly recognizable." *Id.* at 48 (quoting Warrick, *supra*, at 115–16).

Third, by providing al-Qaeda leaders, including al-Rahman, with the ability to operate unhindered in its territory after September 11, Iran created the environment that fostered al-Qaeda and the TTP's relationship. ECF No. 48-1 at 35–37, 49–50. Al-Rahman "played a central role" in facilitating al-Qaeda's alliance with the TTP, as he advised TTP leaders during its nascency. *Id.* at 35. He served as al-Qaeda's "interlocutor with affiliate organizations" and allies in 2007. *Id.* In that role, he "reviewed and provided critical feedback on TTP's charter," marking the beginning of a close relationship between al-Qaeda and the TTP. *Id.* And until his death, al-Rahman provided the TTP with "ideological, legal, and theological guidance" in exchange for safe haven for al-Qaeda members and leaders "in the Pashtun areas along the Afghan-Pakistani border" (where Camp Chapman was). *Id.* at 31, 33, 50. In addition, between 2007 and 2009, the two organizations conducted several joint terrorist attacks, including a 2008 hotel bombing that killed 50 people and wounded 300 others. *Id.* at 38–39.

Ultimately, the close connection between al-Qaeda and the TTP led to the joint planning and execution of the Camp Chapman attack, for which both groups publicly claimed responsibility. *See* ECF No. 48-1 at 42–46, 49–50. Before connecting with al-Qaeda leaders, al-Balawi connected with the TTP, his first point of contact with Islamist militant groups. *Id.* at 50. And as al-Balawi developed a strong rapport with al-Rahman and the plans for the attack began to take shape, he continued to live with TTP members in TTP-controlled territory. *Id.* at 44. Furthermore, al-Balawi worked and trained with TTP militants for "an extended period before executing his suicide bombing." *Id.* at 44, 50. Although "the consensus remains that al-Qaeda masterminded and perpetrated the attack," the TTP was also "culpable in the attack." *Id.* at 42, 44. And Iran's

facilitation of the two organizations' strong relationship—through al-Rahman and Iran's gifts of sanctuary and free passage after September 11—was crucial to the successful execution of the Camp Chapman bombing.

Finally, Gartenstein-Ross shows that Iran functioned as al-Qaeda's "'core pipeline' to move funds and personnel from the Middle East to South Asia."  ECF No 48-1 at 27–29, 49 (citation omitted).  As early as 1992, Iran had developed an informal alliance with al-Qaeda, which allowed the group to funnel funds and operatives through Iranian territory without obstacle.  *Id.* at 21.  In 2007, bin Laden himself recognized the critical role that Iran played in supporting al-Qaeda's operations, writing that Iran was al-Qaeda's "main artery for funds, personnel, and communication."  *Id.* at 28, 50 (citation omitted).  Indeed, Iran had reached a "secret deal" with al-Qaeda in the years before the Camp Chapman attack that "allowed the militant group's operatives to transit money, supplies, weapons, and recruits through Iran to al-Qaeda members in Pakistan."  *Id.* at 28–29, 50; *see also* U.S. Dep't of Treasury, *supra* (noting that, by 2005, a formal agreement had been reached between Iran and al-Qaeda, in which a bin-Laden-appointed al-Qaeda facilitator worked with Iran to secure logistical support for al-Qaeda).  According to Gartenstein-Ross, this "critical transit network" was operational "before, during, and after [al-Qaeda's] involvement in the execution of the Camp Chapman bombing."  *Id.* at 28.

In sum, Gartenstein-Ross determined that "[g]iven the nature and extent of Iranian material support to al-Qaeda, which among other things helped al-Qaeda to forge its cooperative relationship with the TTP, Iran's assistance bore a definite connection to the attack on Camp Chapman."  ECF No. 48-1 at 3, 51.  Gartenstein-Ross's report is on par with the evidence found sufficient in other FSIA cases to show Iran's material support for al-Qaeda.  *See, e.g.*, *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 105–08, 115 (D.D.C. 2015) (relying on expert

testimony to conclude Iran materially supported al-Qaeda by providing access to financial channels, training operatives, and granting safe passage to its members); *see also Thuneibat*, 167 F. Supp. 3d at 36 (finding satisfactory proof based on expert declaration that Syria materially supported al-Qaeda in Iraq through establishing a transit pipeline for foreign fighters and allowing the group to operate unmolested within Syria).  In addition, courts have repeatedly found that Iran has provided al-Qaeda with the material support necessary to commit terrorist attacks against the United States around the world, like the attack on Camp Chapman.  *See Flanagan*, 87 F. Supp. 3d at 105–08 (Iran materially supported al-Qaeda in the 2000 bombing of the *USS Cole*); *Owens*, 826 F. Supp. 2d at 150 (Iran materially supported al-Qaeda in the 1998 embassy bombings in East Africa).  And here, too, Plaintiffs have produced enough evidence to establish that Iran materially supported al-Qaeda in its efforts to plan and execute the Camp Chapman attack.

### ii. Plaintiffs Have Presented Evidence Sufficient to Show that Iran's Material Support Was a Proximate Cause of the Camp Chapman Attack

Plaintiffs have also shown that Iran's material support for al-Qaeda was a legally sufficient cause of the Camp Chapman attack.  *See Owens*, 864 F.3d at 778 (requiring the plaintiffs show that the foreign sovereign's material support is a legally sufficient cause of the terrorist attack at issue).  Plaintiffs need not show that Iran specifically intended to cause the attack; they need only demonstrate proximate cause.  That is, they must show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128–29 (D.C. Cir. 2004) (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)).  To establish this causal connection, a defendant's actions need only have been a "substantial factor" in the sequence of events that caused the plaintiff's injury, and the injury must be a "reasonably foreseeable . . . consequence" of the defendant's conduct.  *Owens*, 864 F.3d at 794.  In other FSIA cases, evidence found to meet this

standard included financial support for the terrorist organization, logistical support for insurgent training, the provision of weapons, and the bolstering of operational capacity. *See, e.g.*, *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019). Less direct forms of support also suffice to establish proximate causation in FSIA cases. *See Foley*, 249 F. Supp. 3d at 204 ("Syria provided material support to the Zarqawi Terrorist Organization by, among other things, allowing that organization to operate within Syria with impunity, giving its members safe haven, and allowing its members and supporters to pass freely through its borders to other countries" in order to commit acts of terrorism against the United States and its allies in the region.).

As noted above, Plaintiffs have adequately shown that Iran has a history of providing material support to al-Qaeda. Gartenstein-Ross explains that Iran played a key role in the recovery, regrouping, and rebuilding of al-Qaeda in the years following September 11. ECF No. 48-1 at 47. And more specifically, for all the reasons explained above, Gartenstein-Ross also concluded that "Iran's assistance bore a definite connection to the attack on Camp Chapman." *Id.* at 3, 51. The most direct example of this connection is Iran's protection of and relationship with al-Rahman. *See id.* at 33–38, 44–48. Through Iran's support, al-Rahman rose to the top level of al-Qaeda leadership and his stature was used to bait the CIA to arrange a meeting with al-Balawi. *Id.* at 48–50. Thus, Iran's provision of sanctuary, free passage across its borders, and other support to al-Qaeda militants were critical factors in the orchestration of the Camp Chapman attack and is enough to show proximate causation in the FSIA context. *See Foley*, 249 F. Supp. 3d at 204.

Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's support for al-Qaeda. *See Roth*, 78 F. Supp. 3d at 394 (FSIA sets a low bar for proximate cause). In other cases, courts have found that backing the organization despite knowledge of its violent tactics and encouraging the escalation of terrorism constituted sufficient evidence of foreseeability. *See id.*

(injuries stemming from a bombing were a foreseeable result of Iran's material support of a terrorist organization because Iran encouraged an increase in terrorist activities); *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 WL 18071921, at *9 (D.D.C. Dec. 28, 2022) (murder caused by the Zarqawi group was a foreseeable consequence of Iran's support of the group because Iran continued to provide support to the group even though "Iran certainly knew" of the group's attacks); *Owens*, 864 F.3d at 798 (Sudan's "general awareness of the group's terrorist aims" satisfies the causation element of a FSIA terrorism claim). Despite their ideological differences, Iran has supported al-Qaeda's goals since the 1990s, when al-Qaeda leaders reached out to Iran and Hezbollah—"Iran's chief terrorist proxy"—for assistance. ECF No. 48-1 at 21. Before the Camp Chapman attack, Iran and Hezbollah had provided al-Qaeda with the training, tactical expertise, and weapons necessary to carry out acts of terrorism against the United States, such as the East African Embassy bombings in 1998, the suicide bombing aboard the *USS Cole* in 2000, and the September 11, 2001 attacks in the United States. *Id.* at 22–25; *see also Est. of Parhamovich*, 2022 WL 18071921, at *6. Following these attacks, Iran continued to materially support al-Qaeda, and supported attacks by other groups across the Middle East. ECF No. 48-1 at 23–27. Thus, Iran well understood al-Qaeda's aims at the time of the Camp Chapman attack and nonetheless maintained its support. Such evidence is enough to show that the Camp Chapman attack was a reasonably foreseeable consequence of Iran's support of al-Qaeda and its allies.

\*     \*     \*

For these reasons, the Court finds that it has subject-matter jurisdiction.

### B.       Personal Jurisdiction

To impose judgment on a foreign state under the FSIA, this Court must also have personal jurisdiction over Iran.  Personal jurisdiction over a foreign government turns on a showing of (1) subject-matter jurisdiction under the FSIA; and (2) proper service under the FSIA.  28 U.S.C. § 1330(b).  As Plaintiffs have already satisfied the first requirement, the Court now turns to the second.

28 U.S.C. § 1608(a) lists four methods of serving a foreign government, in the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a); *see also Fritz*, 320 F. Supp. 3d at 87 ("Section 1608(a) provides four methods of service in descending order of preference" (internal quotation marks omitted)).

Taking Section 1608(a)'s methods of service in order, because Iran does not have a special arrangement for service with Plaintiffs, and it is not a party to an international convention on service, Plaintiffs did not need to attempt service in accordance with Section 1608(a)(1) or (a)(2). *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 370 (D.D.C. 2020) ("No 'special arrangement' governs service between the United States and Iran . . . , and [Iran] is [not] party to an international convention on service of judicial documents."). Plaintiffs thus tried to serve Iran under Section 1608(a)(3). ECF No. 21. They received no response from Iran within the requisite thirty-day waiting period, so they then pursued service through diplomatic channels under Section 1608(a)(4), namely, by diplomatic note forwarded by the State Department to the American Interests Section of the Swiss Embassy in Tehran, Iran. ECF Nos. 29, 31, 36. Although Iran refused to accept delivery of the documents, service was still proper. *See Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52–53 (D.D.C. 2008). Thus, because the Court has subject-matter jurisdiction over Plaintiffs' claims and Iran was properly served under 28 U.S.C. § 1608(a)(4), the Court has personal jurisdiction over Iran.

## C.    Liability

Given the Court's conclusion that is has subject-matter jurisdiction, little else is needed to show that Iran is liable to Plaintiffs for their injuries. *See* 28 U.S.C. § 1605A(c). The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a United States citizen "for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1), (c). So, "a plaintiff that offers proof sufficient to establish a waiver of

foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law" if the plaintiff is a citizen of the United States. *Fritz*, 320 F. Supp. 3d at 86–87. "Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (collecting cases).

As already mentioned, Wise, Paresi, and their family members are U.S. citizens. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22). As a result, and for all the reasons already explained, they may rely on the cause of action in the terrorism exception to establish Iran's liability.[8] *See Owens*, 864 F.3d at 809.

### D.    Damages

Under the FSIA, a foreign state is liable to victims of state-sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Thus, "deceased plaintiffs' estates can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional

---

[8] Some courts in this district have held that Section 1605A(c) provides a cause of action but "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force*, 464 F. Supp. 3d at 361. Thus, those courts say, FSIA plaintiffs must "prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73. Such theories of liability are based on "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises." *Maalouf v. Islamic Republic of Iran*, No. 16-cv-0280, 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020). Though not also in the Amended Complaint, Plaintiffs contend in their Motion that Iran is liable for their injuries under the tort claims of assault, battery, and intentional infliction of emotional distress. ECF No. 48 at 23–27. Thus, if such a showing is required, Plaintiffs have met their burden. Even without such an articulation of a "theory of liability" in their Amended Complaint, "[t]he Court . . . will not exalt form over substance to dismiss [their] action." *Rimkus*, 750 F. Supp. 2d at 176. The facts Plaintiffs have pled and established show liability under the theories of battery, assault, and intentional infliction of emotional distress. *See Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 WL 5422844, at *13–14 (D.D.C. Sept. 10, 2020); *see, e.g.*, *Winternitz*, 2022 WL 971328, at *9 n.8. Thus, they have properly established Iran's liability.

injury; and all plaintiffs can recover punitive damages." *Roth*, 78 F. Supp. 3d at 401–02 (citing

*Valore*, 700 F. Supp. 2d at 83). "To obtain damages against a non-immune foreign state under the

FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably

certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a

'reasonable estimate' consistent with this [Circuit]'s application of the American rule on

damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (some

internal quotation marks omitted) (alteration in original); *accord Kim v. Democratic People's

Republic of Korea,* 87 F. Supp. 3d 286, 289 (D.D.C. 2015).   In determining the "reasonable

estimate," courts may look to expert testimony and prior awards for comparable injuries.  *See Reed

v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012).  But in a default case, the

Court may not exceed the amount demanded by the plaintiff.  *See* Fed. R. Civ. P. 54(c).  As

discussed below, Plaintiffs request and the Court will award both compensatory and punitive

damages.

### 1.      Compensatory Damages

In their Amended Complaint, Plaintiffs sought damages for pain and suffering, economic

loss, and solatium.  ECF No. 10 at 58–61.  But Plaintiffs rescinded their request for pain-and-

suffering damages in their Motion, conceding that the circumstances of Wise's and Paresi's deaths

do not warrant such damages.  *See* ECF No. 48 at 28.  Thus, the Court considers, and will award,

economic-loss damages as explained below.

### a.      The Estate Plaintiffs

The estates of Wise and Paresi seek damages only for economic losses accruing to the

estates.  "The report of a forensic economist may provide a reasonable basis for determining the

amount of economic damages in an FSIA case."  *Reed*, 845 F. Supp. 2d at 214.  Thus, in support

of their requests for economic-loss damages, Plaintiffs have submitted the expert reports of Chad L. Staller and Stephen M. Dripps—respectively, the President and Senior Economist/Manager at the Center for Forensic Economics Studies.  *See* ECF No. 48-3; ECF No. 48-4.  Using reasonable assumptions and reliable calculations, these reports provide estimates of the net economic loss accruing to each estate.

The report for the Wise Estate estimated that Wise's net economic loss—his lost earnings, retirement benefits, and household services, less amounts for personal maintenance and taxes—is $3,677,674.  ECF No. 48-3 at 6–9.  Based on statements received from Wise's wife, Bernhardt, the report assumes that Wise would have returned to medical school, completed a residency program, and found employment as a physician after his 90-day security contract with the CIA. *Id.* at 1–3; *see also* ECF No. 48-5 ¶ 11.  The Court finds this assumption reasonable and thus will award the Wise Estate economic damages of $3,677,674.

The report for the Paresi Estate estimated that Paresi's total economic loss—his lost earnings, military pension benefits, VA disability benefits, retirement benefits, and household services, less amounts for personal maintenance and taxes—is between $2,525,321 and $2,835,747.  ECF No. 48-4 at 6.  The difference between the two figures results from a lack of certainty over when Paresi would have retired, with the lesser amount assuming retirement at the point of eligibility for retirement benefits and the greater amount assuming retirement at the average age an American man leaves the workforce.  *Compare id.* at 7, *with id.* at 8.  The Court finds that, because the record shows that Paresi was searching diligently for employment in the United States around the time of his death, he is entitled to a presumption that he would have obtained a job and worked for at least as long as the average American man.  *Id.* at 2; *see, e.g.*,

*Winternitz*, 2022 WL 971328, at *10.  Thus, the Court will award the Paresi Estate economic damages of $2,835,747.

>    **b.**     **The Family Plaintiffs**

The remaining Plaintiffs are Wise and Paresi family members who were not present for the attack but have suffered severe emotional distress because of the death of their loved ones.  Courts often award damages for solatium or intentional infliction of emotional distress in such cases. *Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2021 WL 2592910, at *4 (D.D.C. June 24, 2021) ("[I]mmediate family members of terrorism victims may state a claim for IIED even if they were not present at the site of the attack.").  Such awards are "functionally identical" and meant to "compensate persons for 'mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort.'" *See Roth*, 78 F. Supp. 3d at 402–03 (citing *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011)).  "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Id.* at 403.

In *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), the court surveyed past awards to family members of victims of terrorism and developed a standardized approach for evaluating solatium claims.  *Id.* at 269.  The *Heiser* court found that, on average, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings."  *Id.*  Specifically, the *Heiser* court found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Id.* (footnotes omitted).  Children of deceased victims are generally awarded $5 million because "children who lose parents are likely to suffer

as much as parents who lose children." *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883 (CKK/GMH), 2020 WL 7869218, at *15 (D.D.C. Mar. 23, 2020) (citation omitted), *report and recommendation adopted*, No. 18-cv-1883 (CKK), 2020 WL 7869211 (D.D.C. Apr. 11, 2020).

In applying the *Heiser* framework, however, courts must appreciate that "[t]hese numbers . . . are not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). While the framework "provides a starting point for a court, it is simply that—a starting point." *Oveissi*, 768 F. Supp. 2d at 26–27. The *Heiser* valuations "act as a center of gravity for solatium awards, around which a court may vary the final amount based on the facts and circumstances of a particular case." *Id.* A court may deviate either upward or downward from the *Heiser* framework, and ultimately, such a decision is committed to the court's discretion. *See id.* at 26–27 ("[I]t is th[e] court's duty to analyze the nature of the claimant's injury and the deviation—if any—that is appropriate to compensate for such losses, while also bearing in mind the general precept that similar awards should be given in similar cases."). Deviations may be warranted when "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Id.* at 26–27. Courts have also recognized the "sudden and unexpected" death of a victim as a factor that contributes to an upward enhancement of solatium damages. *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90 (D.D.C. 2002). For the reasons

explained below, the Court finds that the *Heiser*-damages baselines, with 25% upward enhancements, are appropriate under these circumstances.[9]

As for Wise's family members, Wise's widow, Bernhardt, suffered from severe mental distress because of her husband's death and was later exposed to graphic depictions of the attack. ECF No. 48-5 ¶¶ 26–37.  The Court will accordingly award her a 25% upward enhancement from the baseline award of $8 million, for a total of $10 million.  Wise's stepson Prusinski[10] and mother

---

[9] Although Plaintiffs seek a 50% upward departure, *see* ECF No. 48 at 35–36, 40–41, the Court finds that such a large deviation is not warranted here.  Generally, "departures [from the *Heiser* baseline damages awards] are . . . relatively small."  *Valore*, 700 F. Supp. 2d at 86.  Based on other FSIA cases decided in this Circuit, larger departures of fifty percent or more have been reserved for the most intense cases of suffering.  *See, e.g.*, *Oveissi*, 768 F. Supp. 2d at 30 (finding 50% upward deviation from the *Heiser* baseline warranted because minor plaintiff was forced to go into hiding with armed guards after his grandfather's death); *Valore*, 700 F. Supp. 2d at 84 (finding 50% upward departure from analogous baseline appropriate to compensate a *victim* who sustained severe injuries).  Thus, without diminishing the pain and suffering experienced by Plaintiffs, the Court finds an enhancement of 25% is more in line with awards "given in similar cases."  *Oveissi*, 768 F. Supp. 2d at 26–27; *see, e.g.*, *Thuneibat*, 167 F. Supp. 3d at 52–53 (25% upward departure for younger siblings of victim because their development was impaired by the victim's death); *Flanagan*, 87 F. Supp. 3d at 118 (25% upward departure because the decedent was the center of the family and the plaintiffs submitted medical evidence relating to their emotional distress); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (25% upward departure for siblings who "turned to self-destructive behavior" and "battled depression" after the loss of their sister); *Valore*, 700 F. Supp. 2d at 86 (25% upward departure for victim's sister because of evidence of nervous breakdowns).

[10] One requirement to bring an intentional inflection of emotional distress claim in the FSIA context, as family-member Plaintiffs do here, is that the claim be brought by "immediate family members."  *Valore*, 700 F. Supp. 2d at 78.  The D.C. Circuit has, however, "reasoned that where claimants 'were members of the victim's household' such that they were 'viewed as the functional equivalents of family members,' the immediate-family requirement could potentially be stretched to include . . . non-adopted stepchildren[.]"  *Id.* at 79 (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003)); *see also Stearns v. Islamic Republic of Iran*, No. 17-cv-131 (RCL), 2022 WL 4764905, at *54 n.44 (D.D.C. Oct. 3, 2022); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720, at *48–49 (D.D.C. Aug. 12, 2022). Prusinski, though not adopted by Wise, was "the functional equivalent of [Wise's] son."  ECF No. 10 ¶ 2.  Prusinski called Wise "Dad," and their "bond was inseparable."  ECF No. 48-5 ¶ 41.  Wise also provided for "[Prusinski] and [Bernhardt] completely," listing Prusinski as his "dependent."  *Id.* ¶ 44.  Thus, Prusinski may properly bring a claim here.

have also suffered severe mental distress.  ECF No. 48-5 ¶¶ 45–53; ECF No. 48-6 ¶¶ 25–35.  In particular, Prusinski's childhood development and young adulthood have been significantly harmed by Wise's death.  ECF No. 48-5 ¶¶ 47–52.  And he has been subjected to media stories and depictions about the attack, forcing him to "relive[] the tragedy of [his stepfather's] death." *Id.* ¶ 32.  Likewise, Wise's death had a profound impact on the health of his mother Mary Lee Wise.  ECF No. 48-6 ¶¶ 25–35.  Thus, an upward departure of 25% from the baseline award of $5 million, or $6.25 million, is suitable for both of them.  And finally, because Wise's sister Mary Heather Wise suffered from adrenal exhaustion and now suffers from PTSD, ECF No. 48-6 ¶¶ 10–20, she is also entitled to a 25% increase from the baseline award of $2.5 million, for a total of $3.125 million.

Paresi's family members are entitled to awards of compensatory damages similar to those awarded to the Wise family.  Because Paresi's widow Mindylou Paresi has experienced intense mental anguish from the sudden death of her husband, ECF No. 48-7 ¶¶ 6–16, she is entitled to a 25% upward departure from the baseline award of $8 million in solatium damages, for a total of $10 million.  Likewise, Paresi's stepdaughter Alexandra VandenBroek[11] and daughter Elizabeth Santina Paresi continue to suffer immensely from the death of their father.  ECF No. 48-8 ¶¶ 10–20; ECF No. 48-9 ¶¶ 8–21.  Paresi's stepdaughter left her job for months after his death and encountered repeated media depictions and news stories relating to the attack.  ECF No. 48-8 ¶¶ 10–20.  As for his daughter, she began to experience bullying at school, developed severe

---

[11] Like Prusinski, VandenBroek was not adopted, but her stepfather "treated [her] as the functional equivalent of his daughter in every way."  ECF No. 48-8 ¶ 3; ECF No. 10 ¶ 6.  They had a "very close parent-child relationship."  ECF No. 48-8 ¶ 4.  VandenBroek says he "was a true head of the household," and "[f]inancially, he provided, food, shelter, and everything in between for [her] family."  *Id.* ¶ 9.  Thus, the Court finds she can properly bring a claim here.  *See Valore*, 700 F. Supp. 2d at 79.

anxiety and depression, and even contemplated taking her own life following her father's death. ECF No. 48-9 ¶¶ 15–18; ECF No. 48-7 ¶ 13.  Thus, an upward departure of 25% above the baseline award of $5 million, or $6.25 million, is proper for each of them.  Paresi's mother Janet Paresi has undergone similar trauma, enduring a "drawn out and incredibly difficult" grieving process.  ECF No. 48-10 ¶¶ 8–16.  The Court will therefore award her a 25% enhancement from the baseline award of $5 million, for a total of $6.25 million.  Lastly, Paresi's two siblings continue to struggle with the pain of his loss.  His brother Terry Paresi was "wrecked" after Paresi's death and now takes medication for anxiety.  ECF No. 48-11 ¶¶ 7–8.  His sister Santina Cartisser struggles to "convey the absolute shock that went through [her] brain" when she learned of his death, and she notes the breakdown of her family without Paresi to "keep [them] together."  ECF No. 48-12 ¶¶ 4–12.  They too are each entitled to a 25% increase above the *Heiser* baseline of $2.5 million, for a total of $3.125 million each.

The Court also notes that the 25% upward enhancement for all the family-member Plaintiffs is buttressed by the "circumstances surrounding the terrorist attack," which here rendered "the suffering particularly more acute or agonizing."  *Oveissi*, 768 F. Supp. 2d at 26–27.  Wise and Paresi were killed in a most violent, "sudden and unexpected" manner.  *See Stethem*, 201 F. Supp. 2d at 90; *see, e.g.*, ECF No. 48-1 at 41; ECF No. 48-5 ¶ 28 (Bernhardt noting the "traumatic way that [Wise] died"); ECF No. 48-9 ¶ 14 (Elizabeth Santina Paresi noting how, at his funeral, Paresi's body "had been damaged so badly in the blast that his entire form was covered in wraps and bandages").  Not only did the event itself shock the family-member Plaintiffs, but given its high-profile nature, they have in various forms been subjected to repeated reminders of the tragedy, including through the film *Zero Dark Thirty*.  *See, e.g.*, ECF No. 48-5 ¶ 31; ECF No. 48-8 ¶¶ 15–16, 20; ECF No. 48-9 ¶ 27.

For these reasons, the Court will award a total of $60,625,000[12] in compensatory damages to the family-member Plaintiffs.

### 2. Punitive Damages

Under the FSIA, a foreign sovereign who is a state sponsor of terrorism may be held liable for punitive damages.  28 U.S.C. § 1605A(c).  Punitive damages are awarded not to compensate the victim but to punish and deter future "outrageous conduct" by the foreign state.  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012); *see Est. of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 27, 29–30 (D.D.C. 2009) ("All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." (citation omitted)).  In deciding whether to award punitive damages, courts look to four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Doe v. Syrian Arab Republic*, 2020 WL 5422844, at *17 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)).  Courts have found these factors satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism.  *See, e.g.*, *Baker*, 775 F. Supp. 2d at 85 (finding that an award of punitive damages warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known

---

[12] To sum up, the awards of solatium damages to the family-member Plaintiffs is as follows: (1) Dana Bernhardt: $10 million; (2) Ethan Prusinski: $6.25 million; (3) Mary Lee Wise: $6.25 million; (4) Mary Heather Wise: $3.125 million; (5) Mindylou Paresi: $10 million; (6) Alexandra VandenBroek: $ 6.25 million; (7) Elizabeth Santina Paresi: $6.25 million; (8) Janet Paresi: $6.25 million; (9) Terry Paresi: $3.125 million; and (10) Santina Cartisser: $3.125 million.

terrorist organization whose *modus operandi* included the targeting, brutalization, and murder of American citizens and others").

Upon consideration of these four factors, the Court finds that a substantial award of punitive damages is justified here, as courts have similarly concluded in other FSIA cases against Iran for acts of terrorism.[13]  As for the first factor, the Camp Chapman attack—made possible by Iran's provision of material support to al-Qaeda—was nothing short of horrific.  *See Bodoff*, 424 F. Supp. 2d at 88 (finding bus bombing, for which Iran was liable, to be "extremely heinous"); *Valore*, 700 F. Supp. 2d at 87–89 (finding marine-barracks bombing in Lebanon, for which Iran was found liable, "among the most heinous [acts] the Court [could] fathom").  And al-Qaeda has leveraged Iran's support since the 1990s to help it carry out terrorism around the globe.  *See* ECF No. 48-1 at 20–30.  The second factor also points to a substantial award.  As already discussed, Iran's support led to Wise's and Paresi's violent and sudden deaths, devastating their families in the process.  As for deterrence under the third factor, several courts have determined that the need to deter sovereign states, like Iran, from committing terrorist acts in the future is great.  *See Flanagan*, 87 F. Supp. 3d at 119–20 (collecting cases).  That is clearly so in the case of the Camp Chapman attack, which caused such a dramatic loss to the U.S. intelligence community.  ECF No. 48 at 2 (labelling the attack as the "single deadliest episode" for the CIA since September 11, 2001 (quoting Rubin & Mazzetti, *supra*); ECF No. 48-2 at 1, 5 (Congressman Silvestre Reyes calling the Camp Chapman attack the "deadliest day for the CIA since the bombing of the Beirut Embassy in 1983").  Finally, Iran's significant wealth supports an award of punitive damages.  *See*

---

[13] *See, e.g.*, *Roth*, 78 F. Supp. 3d at 407 (awarding $112,500,000 in punitive damages for restaurant bombing); *Valore*, 700 F. Supp. 2d at 89–90 (awarding $1 billion in punitive damages for bombing of a marine barracks); *Heiser*, 659 F. Supp. 2d at 31 (awarding $300 million in punitive damages for bombing of a residential complex).

*Gross Domestic Product for Islamic Republic of Iran*, Fed. Reserve of St. Louis (Dec. 27, 2022) (noting Iran's GDP of $359.71 billion in 2021), https://fred.stlouisfed.org/series/ MKTGDPIRA646NWDB.  Punitive damages are thus warranted in this case.

The amount of punitive damages is another question, and courts have used several methodologies to calculate them.  Some courts award punitive damages in an amount three to five times the defendant's "annual expenditure on terrorism."  *Acosta*, 574 F. Supp. 2d at 31; *Valore*, 700 F. Supp. 2d at 89–90.  Because of rising annual expenditures by state sponsors of terrorism, this approach is "considered more appropriate for cases involving 'exceptionally deadly' attacks." *Doe v. Syrian Arab Republic*, 2020 WL 5422844, at *17 (citation omitted).  Plaintiffs, however, presented no evidence of Iran's annual expenditure on terrorism.  Instead, they concede that the Camp Chapman attack—although tragic to the victims and their families—"[does] not rise to the 'exceptionally deadly' level . . . to merit a multiplier of Iranian expenditures on terrorism."  *See* ECF No. 48 at 43.

Other courts have simply awarded $150 million for each victim's family.  *See Baker*, 775 F. Supp. 2d at 85–86.  But that approach is usually reserved for "the most repugnant and premeditated attacks."  *Neiberger*, 2022 WL 17370239, at *19; *see, e.g.*, *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (finding that the recording, publication, and distribution of video footage of the torture and murder of two civilian contractors "glorified cruelty and fanned the flames of hatred," warranting an award of $150 million in punitive damages per family).

The third approach "is to multiply the total compensatory-damages award by a factor of between one and five."  *Doe v. Syrian Arab Republic*, 2020 WL 5422844, at *18; *see also Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018).  Several courts in this District

have adopted this approach in other FSIA cases, and Plaintiffs agree it makes sense to use it here too.  ECF No. 48 at 43.  Courts choose the multiplier by weighing several "factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding of terrorist activities."  *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 10 (D.D.C. 2019).  Though not without exception, generally the "[t]he multiplier has ranged between three and, in exceptional cases, five."  *See Roth v. Syrian Arab Republic*, No. 14-cv-1946 (RCL), 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018).

The Court will apply a multiplier of three to the compensatory damages to determine the punitive damages award, as other courts have when addressing attacks of similar degree and kind.  *See Roth*, 2018 WL 4680270, at *17; *see also, e.g.*, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50–51 (D.D.C. 2012) (determining that there were no exceptional circumstances present in the bombing on the *USS Cole*, which claimed the lives of seventeen servicemen and women, and injured another forty-two), *vacated on other grounds*, No. 10-cv-1689 (RCL), 2019 WL 8060796 (D.D.C. Sept. 11, 2019).  Thus, applying a multiplier of three to the total amount of compensatory damages, $67,138,421,[14] the resulting punitive-damages award will be $201,415,263, to be apportioned to Plaintiffs based on their relative share of the compensatory-damages award.

### 3.    Interest, Attorneys' Fees, and Costs

Plaintiffs also requested in their Amended Complaint prejudgment interest, an award of attorneys' fees, and reasonable costs and expenses.  ECF No. 10 at 58–60.  But in their Motion,

---

[14] This is the sum of the $3,677,674 award of economic damages to the Wise Estate; $2,835,747 award of economic damages to the Paresi Estate; and $60,625,000 award of solatium damages to the family-member Plaintiffs.

Plaintiffs have opted to withdraw their requests for prejudgment interest.  ECF No. 48 at 43 n.27.

They do not mention whether they still intend on recovering attorneys' fees or reasonable costs

and expenses.  *See id.* at 43–44.  But in any event, the Court cannot award them now, because

Plaintiffs "have not provided any information regarding the fees and costs sought."  *Schooley v.*

*Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *79 (D.D.C. June 27, 2019).  The

request, to the extent it remains, is therefore denied without prejudice.  Of course, Plaintiffs "may

file a post-judgment motion for attorneys' fees in accordance with Federal Rule of Civil Procedure

54(d)(2)(B), and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1)."  *Id.*

## IV.  Conclusion

For all these reasons, the Court will grant Plaintiffs' Motion for Default Judgment, ECF

No. 47, and award damages in the total amount of $268,553,684.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 22, 2023